Norman R. GLENN, Plaintiff,

v.

**ADVERTISING PUBLICATIONS, INC.,**
Defendant.

United States District Court
S. D. New York.

March 2, 1966.

Golenbock and Barell, New York City, for plaintiff. Seymour Kleinman, Leonard W. Wagman, New York City, of counsel.

White & Case, New York City, for defendant. William D. Conwell, John D. Lockton, Jr., New York City, of counsel.

McLEAN, District Judge.

This is an action at law for damages for injurious falsehood. Plaintiff also describes his action as one for unfair competition. There being diversity of citizenship between the parties, jurisdiction rests on 28 U.S.C. § 1332. Plaintiff also asserts that the court has jurisdiction under 15 U.S.C. § 1121 and 28 U.S.C. § 1338 on the theory that his claim is based, not only on the common law, but also on Section 43(a) of the Lanham Act (15 U.S.C. § 1125(a)).

In substance, it is a controversy between two trade publications. Plaintiff is the assignee [1] of Sponsor Publications,

---

1. Sponsor first transferred the claim to its stockholders, who in turn transferred their rights to Glenn, the present plaintiff. Defendant claims that Sponsor's cause of action was not assignable and hence that Glenn may not maintain this action. Judge Dawson ruled against defendant on this point and granted Glenn's motion to be substituted for Sponsor Publications, Inc. as the party plaintiff. Sponsor Publications, Inc. v. Advertising Publications, Inc., 60 Civ. 1901 (S.D.N.Y. 2/21/64) (unreported).

Inc., which originally began this action in 1960 and which, until it transferred its assets to another corporation in December 1963, had published "Sponsor," a weekly magazine devoted to news of the broadcasting industry, i. e., radio and television. Norman R. Glenn was president of Sponsor Publications, Inc. and published Sponsor in that capacity from 1946 until December 1963. He is now president of Sponsor's purchaser and is still publishing the magazine.

Defendant since 1930 has published "Advertising Age," a weekly newspaper which contains news of the advertising world in general. Because it covers all forms of advertising, it is referred to in the trade as a "horizontal" publication. Sponsor, on the other hand, because it specializes in a particular type of advertising, is called a "vertical" publication. All these trade publications, whether horizontal or vertical, are eager to sell advertising space in their pages. The people who advertise in them, unlike advertisers in other types of periodicals, are not, in the main, manufacturers of products, but rather are people who themselves are trying to sell advertising. Thus, in the jargon of the trade, both "space media," i. e., newspapers and magazines, and "time media," i. e., radio and television stations, advertise themselves in Advertising Age. Sponsor, being a "broadcast book," attracts primarily the advertisements of the time media.

In December 1958 Advertising Age caused a "readership survey" to be made under the auspices of a professional survey and market research organization, Crossley S–D Surveys, Inc. ("Crossley"). Advertising Age distributed copies of Crossley's report of its survey to prospective advertisers, i. e., radio and television networks and stations and their representatives. It also prepared a brochure of its own entitled "All industry study of media/time buying influences," which described the results of the Crossley survey.

It distributed copies of this brochure widely among these prospective advertisers. Finally, Advertising Age supplemented the brochure with "an audio-visual presentation," i. e., a film of slides enlivened by sound and incidental comic relief. It was entitled "The Real McCoy." It also set forth the results of the Crossley survey. Advertising Age showed the film to these prospective advertisers. The purpose was to convince the time media and their representatives that Advertising Age enjoyed such a "reading preference" among prospective customers of the time media, i. e., persons desirous of advertising their wares on radio and television, and the advertising agencies who advised them, as to make it advantageous for the media to advertise their facilities in Advertising Age.

Plaintiff claims, in essence, that the Crossley report itself and defendant's brochure and film based thereon, contain false and misleading statements, that defendant knew that they were false, that defendant made them maliciously and with intent to injure Sponsor, and that they in fact did injure Sponsor by diverting to Advertising Age advertising of television and radio stations which Sponsor would otherwise have secured. To appraise this contention requires a summary of the evidence relating to the making of the Crossley survey, to the contents of the documents and film to which it gave rise, and to the influence exerted by the documents and film upon prospective advertisers.

The survey was conceived in 1958 by Gorden D. Lewis, defendant's manager of advertising sales. Earlier in that year, he had been impressed by reading a survey made by Crossley for Business Week reporting on the reading preferences of persons on the prospect list of Parade Magazine. It occurred to him that a similar survey could be made of the reading habits of persons on the prospect lists of radio and television networks and station representatives.[2] He assumed

2. A network is a national chain of radio or television stations. Time on those stations is sold by a single organization.

There are many "independent" stations in various parts of the country which are not affiliated with a network. The sale

that the networks and the station representatives, who are the sellers of broadcast time, must consider that the people on their prospect lists, mainly personnel of advertising agencies and advertising departments of corporations, are to some extent involved in purchasing broadcast time. Otherwise, they would not be prospects and would not be on the list. He reasoned that if such a survey demonstrated that Advertising Age was the favorite trade publication among these readers, the survey would afford Advertising Age a powerful argument to induce the networks and stations to advertise in its pages.

In November 1958, Lewis retained Crossley to conduct the survey. Crossley assigned one of its research associates, Franklin B. Leonard, to take charge of the work.

Lewis wrote to several networks and a number of leading station representatives, approximately 38 in all, requesting the use of their prospect lists for this purpose. Thirteen complied with his request. All but one of them sent their lists to Lewis, not to Crossley. There were many duplications of names on the various lists which had to be removed. Lewis entrusted this labor to a company in Chicago called The Letter Shop, which had worked for Advertising Age on previous occasions. The Letter Shop typed the names on cards, sorted them, purported to remove the duplications, and furnished to Crossley the master list thus prepared. Crossley inserted the

thirteenth list. The final master list contained 17,350 names.[3]

Leonard and Lewis jointly prepared a questionnaire to be sent to each person on the list. It was substantially the same as the questionnaire which had been used in the Business Week survey. It asked the following questions:[4]

"1. What business or trade publications of all types do you read regularly?

2. Now please list the one publication you find most useful in your job.

And for Classification Purposes:
Your Title? _____
Your Dept.? _____

What are your job responsibilities? _____

What does your company make or do? _____ "

After the questionnaire was prepared, Lewis sent copies of it to eight other trade publications, including Sponsor, and invited them to participate in the survey. All declined, with the exception of Sales Management which agreed to allow its name to be used and to defray part of the cost. It took no part in the work of the survey. Some of the invitees accompanied their refusal with caustic comments to the effect that the survey was "loaded" in favor of Advertising Age.

On December 2, 1958, Crossley sent out the questionnaires, over the signature of a Crossley vice president, to all 17,350

---

of broadcast time on an independent station, or a group of independent stations, is frequently handled by an agent known as a "station rep." Broadcast time on national networks is generally referred to as "network time"; that on independent stations as "spot time."

3. Subsequently Crossley made a spot check of the master list and concluded that it still contained duplications to the extent of approximately 5.3 per cent because of minor differences in the spelling of names, minor variations in company affiliations, etc.

4. These questions were prefaced by an introductory sentence which read:
"In order to assist one of our clients in determining whether he is placing his advertising where it will be most effective, we are trying to find out what business or trade publications of all types you read regularly."
This statement was untrue, inasmuch as Crossley's client was not someone interested in determining whether he was placing his advertising where it would be most effective. According to Crossley, misrepresentations of this sort are not unusual in the market research business. In any case, it has no relevance to the issues here.

people on the master list. Some were never delivered because the addressees turned out to be dead or missing. There was also the duplication previously mentioned of some 5.3 per cent. Deducting these "ineffective" questionnaires from the 17,350, Crossley estimated that the effective mailing totaled 16,077.

Crossley received 2,944 replies, which constituted 18.3 per cent of the 16,077 effective questionnaires. Crossley tabulated these responses in a variety of ways. Some of these tabulations involved a distinction between respondents who were employed by the "top 50" advertising agencies and the "top 100 United States advertisers" and respondents who were not fortunate enough to be so employed. The questionnaires were coded by Crossley to make this classification possible. The names of the "top," i. e., the largest, advertising agencies were obtained from a list which had been published by Broadcasting Magazine. The names of the top 100 national advertisers were obtained from a list which had been published by Advertising Age.

Inasmuch as the questionnaire requested information on "business or trade publications," references in the replies to other types of publications, newspapers and general magazines, were eliminated from the tabulations. Furthermore, only the 40 business and trade publications which were most frequently mentioned in the replies to the question "What business or trade publications of all types do you read regularly?" were included in the tabulations.[5]

Crossley tabulated the replies to the "publications read regularly" question according to the type of business of the respondents, first breaking down the total replies between advertising agencies and advertisers and then further breaking down each class between the top 50

agencies and all others, and the top 100 advertisers and all others.

Crossley next classified the "publications read regularly" responses from advertising agency personnel according to the job function of the respondent, i. e., "account executives," "officers, owners, partners and general executives," "marketing and merchandising executives," etc. One of the classifications used for this purpose was described as "media/-time buyers." The importance of this category to the issues in this case will subsequently appear.

Crossley made a similar classification of responses to this question from advertiser personnel, classifying them under various headings, i. e., "advertising executives," "administration executives," "sales executives," etc. Next, it classified the advertiser responses by industries, separating the manufacturing industries from the non-manufacturing industries and further breaking down the manufacturing industries into food, drugs, machinery, etc.

Crossley made similar tabulations and breakdowns of the responses to the second question on the questionnaire, i. e., "the one publication you find most useful in your job."

Advertising Age won in most classifications and categories. It received the most mentions in the replies to each of the two questions, i. e., the "read regularly" question and the "most useful" question, both in overall total and as broken down between agencies and advertisers and as further broken down between "top 50" and "top 100" respectively, and "all others." It won with respect to the "read regularly" question in every advertising agency job function category except "Radio/Television Programing and Production" where

---

5. Plaintiff complains about this. He points out that certain business publications of a general nature, as, for example, Forbes, The Nation's Business and the Harvard Business Review, and various technical trade journals, for example, Food Field Reporter and Super-

market News, received mention. He contends that these publications were intentionally omitted from the tabulations because to include them would have revealed that the survey was not as "broadcast oriented" as it purported to be.

Sponsor had 88 mentions to Advertising Age's 79.

It did not fare quite as well in the job function categories of the advertisers. In certain of these categories, "administration executives," "sales executives," "public relations executives," and "other executives and miscellaneous," it was beaten out by Business Week or Sales Management.

With respect to the "most useful" question, Advertising Age won in overall total and in every classification and sub-classification except again as to "Radio/Television Programing and Production" respondents in advertising agencies, where Sponsor won with 39 mentions, Broadcasting-Telecasting came in second with 23, and Advertising Age third with 18, and in certain job function categories among advertisers, i. e., "Sales Executives," "Administration Executives," and "Public Relations Executives," where Advertising Age was outnumbered by Business Week, Wall Street Journal, or Sales Management.[6]

Crossley embodied the results of the survey in a formal report dated February 20, 1959, which it submitted to Advertising Age and Sales Management. The report was entitled "Business Publication Reader Preferences Study." The foreword to the report stated:

"The purpose of this study was to determine the business paper reading preferences of people involved in television and radio time buying decisions."

The report named the thirteen organizations which had supplied their prospect lists. It made clear that the persons surveyed were the names on those lists. It stated that 2,944 replies were received and tabulated, of which 1,845 were from advertising agency personnel and 1,099 from advertiser personnel. A copy of the questionnaire was included in the report. A "technical appendix" pointed out certain caveats. For example, it was noted

that the words "read" and "regularly" may mean different things to different people.

Advertising Age distributed 600 copies of this report to its salesmen to show to prospective customers. The technical appendix was omitted from an undetermined number of these copies. This omission is said to have been an oversight.

Before turning our attention to Advertising Age's subsequent brochure and "The Real McCoy," it may be helpful to note at this point plaintiff's criticisms of the survey itself and of Crossley's report of its results.

Considerable evidence at the trial was devoted to the definition of the phrase "time buyer." This evidence makes it clear beyond doubt that in a narrow technical sense, a time buyer is a purchasing agent. He is an employee of an advertising agency who, when informed by superior authority that the client wishes to spend a specified sum in buying spot radio or television time in a specified area, proceeds to execute these instructions by selecting the stations in that area and by contracting with them for a certain number of minutes of advertising time at a certain hour at a certain price. Large advertising agencies have several of these people in their employ. Small agencies have only one and in some instances less than one, in the sense that one employee may combine time buying with other duties. It is estimated that there are approximately 2,000 professional time buyers in the United States.

The evidence makes it equally clear that in a larger sense there are many people in advertising agencies and in the advertising departments of corporations who influence time buying, and could fairly be said to be involved in time buying decisions, even though they are not themselves purchasing agents. The selection of the geographical market in which

6. It may also be noted, although it is of no materiality here, that Advertising Age did not come out first on either question in the Apparel, Leather and Textile Mill Products category in the breakdown of manufacturing industries.

to advertise, a decision made by executives of advertising agencies in conjunction with executives of the client, can be called a time buying decision in the broadest sense in that it affects where the time is ultimately to be bought. Slightly more narrowly, the decision of the plans board or control group of the agency, reached in conjunction with advertising managers of the client, to spend a certain dollar amount in radio and television advertising, as opposed to newspaper and magazine ("print") advertising, is a time buying decision. Still more narrowly, the media director, whose field of responsibility may cover all media, both space and time, may have a part in the decision of what time to buy.

Plaintiff challenges the validity of the fundamental assumption which underlies the entire Crossley survey, i. e., that the people whose names are on the prospect lists of the sellers of time, of the networks and the station representatives, are people who are "involved in television and radio time buying decisions." Plaintiff points to an irate letter to Crossley from an editor of Time Magazine who received one of the questionnaires. It seems possible that his name was put on a prospect list because the person who prepared the list assumed from the name of his publication that he must have something to do with time. This is, of course, an isolated instance, but plaintiff argues that there must have been many other "prospects" on the list who were actually not involved in time buying decisions by any definition. He contends that the lists were loaded with "high echelon names" of "top brass executives," who would naturally read a general publication like Advertising Age, but whose duties in no way related to the purchase of broadcast time.[7] In this connection plaintiff complains of the inclusion of advertiser personnel in the list on the ground that "broadcast books" like Sponsor are notoriously weak in reaching advertisers, as distinct from ad-

vertising agencies, a fact which Lewis recognized in a letter to Broadcasting Magazine dated April 25, 1959.

In addition to this general criticism of the lists, plaintiff specifically attacks the composition of one of them, that furnished by Headley-Reed Company, a station representative. The controlling stockholder of this company also owned the Kelly-Smith Company, which represented newspapers. The two companies shared the same office.

The former president of Headley-Reed testified that in response to Lewis' request for Headley-Reed's customer and prospect list, he sent to Lewis not only that list, but also the Kelly-Smith list. The latter was made up almost exclusively of the names of print buyers, i. e., buyers of newspaper advertising space.

Lewis denied that he requested or received the Kelly-Smith list. The Crossley report sets forth the names of the list suppliers. Headley-Reed is included, but Kelly-Smith is not. Leonard testified that if a Kelly-Smith list had been received, it would have been mentioned.

The letter of transmittal dated November 11, 1958 from the Headley-Reed Company is on the letterhead of that company signed by the president of that company. It does not mention Kelly-Smith.

Lewis' letter dated November 13, 1958 to The Letter Shop encloses a list in three parts described as the list "from Headley-Reed Company." No mention is made of Kelly-Smith.

The president of Headley-Reed testified that each company had its own letterhead and each had its own name on its prospect list.

On all the evidence, I am persuaded that the president of Headley-Reed was mistaken in his recollection. I find that the only list submitted by that company was the Headley-Reed Company list of prospects in the radio and television field.

Plaintiff's second objection relates to the time buyer in the narrow purchasing

7. This alleged fundamental fallacy plaintiff characterizes as the "specious broadcast nexus" of the survey.

agent sense. The Crossley questionnaire asked its respondents to specify their "title" and their "job responsibilities."

126 respondents out of 2,944 indicated that their primary responsibility was to buy time. 101 of these 126 read Sponsor regularly, as compared to 70 who regularly read Advertising Age.[8] 32 indicated that their primary responsibility was to buy space. Some 288 others were media buyers who frequently noted that they bought both time and space, and media department executives, such as director or supervisor. Although many executives did not bother to explain their job responsibilities, or responded only in generalities, some said that their jobs included media buying, and a handful referred specifically to time buying.

In its tabulation of these 446 responses, Crossley did not set up a separate category of time buyers or space buyers or even of media buyers. Instead, on Lewis' instructions, it created a category of "media/time buyers" and lumped under that heading all the responses above mentioned.

The phrase is a misnomer, for media includes both space and time. It is not synonymous with time alone.[9] It is as though one spoke of "the human race/men," ignoring women completely. The use of this category served to gloss over the fact that many of the responses included in it were not from people who described themselves as time buyers. Moreover, it concealed the fact that some of the respondents actually were self-styled space buyers. Plaintiff contends that the phrase was used intentionally with a deceptive purpose.

Plaintiff also complains that the questions asked in the survey were too broad and unfocused. They did not ask what publication the respondent found most useful for broadcasting purposes, but only which he found most useful in general. The answer, therefore, did not

necessarily prove that the respondent who favored Advertising Age found it most useful in any matter involving the purchase of broadcast time.

Finally, plaintiff complains that Crossley was not really independent, that it obeyed Lewis' instructions to the letter, that it did not take charge of the lists but permitted them to be sent directly to Advertising Age and that it did not even take charge of consolidating the lists but permitted this to be done by Advertising Age's designee, The Letter Shop. Plaintiff says that it was inaccurate for Crossley to say in its report that Crossley "was given complete responsibility for the details of operation and presentation."

I turn now to the brochure which Lewis caused to be prepared and which was printed in large quantities and distributed to Advertising Age salesmen in 1959 for use as a selling tool. Crossley had no hand in its preparation, although its name was used, apparently without its permission, on the cover.

In general, this brochure was an attempt to present in graphic form, in a manner more arresting than the dull statistical tables of the Crossley report, the results of the survey. It also included some "Reader Duplication Studies" prepared by Crossley but not included in its report, and some additional material which had nothing to do with Crossley or with the survey. The brochure contained some inaccuracies.

The cover was headed:

"Crossley
S–D All industry study of
Surveys media/time buying influences"

The prominent display of the phrase "media/time buying" is readily apparent.

The first page of the text was headed:

"Who Buys Broadcast Time and Services and *How* Do They Buy Them?"

---

8. Sponsor beat out its rival Broadcasting Magazine on the "read regularly" question, but lost out to it on the "most useful" question.

9. It may be noted, however, that three respondents stated that their job title was "media time buyer."

Then follows a passage which plaintiff says in effect "forged Sponsor's endorsement" to the Advertising Age project. It appears that in 1954 Sponsor had published a booklet entitled "All-Media Evaluation Study" based on some questionnaires which it had sent out to advertising agencies and advertisers.[10] This study set forth two tabulations under the heading "Who determines the medium or combination of media to be used in a campaign?" The tabulations showed that a substantial majority of the advertising agency personnel who answered the Sponsor questionnaire thought that in the agency it was the account executive who determines the medium. Next highest were the media director, the plans board and the president, in that order. A substantial majority of the advertiser personnel who responded thought that in their companies it was the advertising manager who determines the medium. Next highest were the sales manager and the president, in that order.

Advertising Age copied these tabulations on page 1 of its brochure under the headings "Agencies Say 'Most Influential'" and "Advertisers Say 'Most Influential'." It prefaced the charts with the following remark:

"Take a look at this chart below at the left from Sponsor Magazine's 'All Media Evaluation Study'. It shows who are the most influential people in buying of time and media selection."

Comparison of Sponsor's charts with Advertising Age's purported copy of them shows that the copy was incorrect in that Sponsor's charts were concerned with "who determines the medium," not with "who are the most influential people in buying of time." Indeed, to make matters a little worse, the Advertising Age brochure put quotation marks

around the words "most influential," thereby representing that Sponsor had used this very phrase, when in fact it had not.[11]

Immediately following the charts, the Advertising Age brochure went on to say:

"In advertising agencies, this study by Sponsor shows that the account executive is the most important person, followed ·by the media/or time buyer, then the plans board group and the agency president."

Here we see another instance of the use of the "media/or time buyer" phrase, this time in a context which seems to attribute it to the Sponsor study. In fact, the Sponsor study had not used it.

The substance of the sales argument made in the opening pages of the brochure was that although the time buyer, i. e., the purchasing agent, is important, there are many other people involved in time buying decisions whom the would-be seller of time should attempt to reach. The brochure pointed out that considerable controversy had existed as to the most effective way to reach these people.

"And here, you run into claims and counterclaims, idle boasting, surveys carefully tailored to prove how good the surveyor is—statistical juggling * * * and confusion many times confounded."

The brochure went on to state:

"Because of the many conflicting claims about circulation and readership among papers serving the broadcasting and advertising field, a number of broadcasters suggested that it was high time that something be done to get all the significant facts out in the open.

"As a result, Advertising Age proposed the biggest, most careful, un-

---

10. Questionnaires, studies and surveys are numerous in this business. Apparently there are always a certain number of recipients who dutifully answer the questionnaires.

11. When asked about this on the witness stand, Lewis conceded that "most influential" was not a direct quotation from the Sponsor study, but said that he had thought that the use of quotation marks would lend emphasis to his presentation.

biased study ever made of all the buying influences concerned with the broadcasting field." [12]

The brochure then proceeded to describe the Crossley survey. After pointing out that thirteen radio-television representative organizations, group owned stations and networks agreed to supply their prospect lists, the brochure stated:

> "The customer and prospect lists supplied by these 13 organizations, representing both advertisers and advertising agencies, were given to Crossley, S-D Surveys, who consolidated them into one master list from which all obvious duplications were removed."

This statement, as we have seen, was inaccurate, inasmuch as all but one of the lists were delivered, at least in the first instance, to Advertising Age, not to Crossley, and the consolidating was done, not by Crossley, but by The Letter Shop.

The brochure went on to note that 2,944 replies were received to the Crossley questionnaire, "by far the biggest sample ever made of a list of broadcast advertising buyers."

Following this foreword, the brochure set forth a number of the Crossley tabulations in condensed form, pointing out in some instances that Advertising Age had showed up better than Sponsor and other broadcast books combined. The brochure had a page for "Media/Time Buyer" responses. It also had a page for "Radio-TV Programming & Production People," the category in which Sponsor won, and pages for some of the advertiser categories in which Sales Management or Business Week had won.

Plaintiff complains that the headings on some of these charts were misleading, as, for example, the heading on the first chart which reads "What Radio-TV Customers & Prospects 'Read Regularly'." No such heading appears in the Crossley report itself. It would be obvious, however, to anyone who read the foreword to the brochure that the respondents to the questionnaire were thus described because they were people whose names appeared on the customer and prospect lists of radio and TV organizations.

Plaintiff also complains that some of the tabulations in the brochure were unfair in that they combined certain categories which should have been stated separately. The "media/time buyer" category is the prime example of this. Another instance is the combination in the brochure of two columns in the Crossley report, the returns from sales executives and from marketing executives of advertisers. Advertising Age did poorly with the sales executives and well with the marketing executives. By showing a combined total for the two under the heading "Sales and Marketing Executives," Advertising Age's poor showing among sales executives was minimized.

The brochure then devoted itself to "reader duplication studies," charts which interpreted the figures by listing Advertising Age first in the respective categories, and then setting forth the comparatively limited extent to which the other publications added "unduplicated coverage," i. e., the comparatively few respondents who mentioned a given publication who had not also mentioned Advertising Age. Six of these charts were included, two prepared on a non-cumulative and four on a cumulative basis.

With the cumulative charts, the order in which the publications are listed makes a difference. The farther down the line a publication appears, the less unduplicated coverage it adds to those which precede it. In the three cumulative charts in the brochure which listed both Sponsor and Broadcasting Magazine, Broadcasting Magazine was listed ahead of Sponsor in two, although Sponsor had received more total mentions than Broadcasting.

---

12. The evidence does not indicate that "a number of broadcasters" suggested the Crossley survey, as this statement implies. It apparently was conceived solely by Advertising Age.

"The Real McCoy" contained substantially the same material as the brochure, presented on slides, with a voice accompaniment and interlaced with supposedly humorous or eye-catching pictures, some of which were totally irrelevant to the subject in hand. Sponsor's 1954 All-Media Evaluation Study was prominently featured in substantially the same manner as in the brochure. The film included the chart which revealed that Sponsor had been most frequently mentioned by radio-TV programming and production people, but apropos of this chart, the voice, after a preliminary chuckle, remarked, "But these people don't usually buy time."

Plaintiff contends that the false and misleading aspects of the survey, the brochure and the film were deliberate, and that they were maliciously intended by Advertising Age to injure Sponsor. In support of this contention, plaintiff points to certain of Lewis' correspondence. On December 3, 1958, at the very beginning of the campaign, Lewis wrote to Sales Management and also to Printers' Ink as follows:

"The main objective which I have in proposing this 'survey of surveys' is to put some of these broadcasting publications—and I don't mean Broadcasting Magazine—on the spot, and expose them to some comprehensive and honest findings which they will find difficult to distort.

\* \* \* \* \*

"I thought you might find this letter of some personal interest—as well as being further evidence that I have taken off the silk gloves as far as the broadcasting press is concerned, but excluding Broadcasting Magazine."

On April 13, 1959, Lewis wrote to Broadcasting Magazine about the cumulative duplication studies. He said:

"Sponsor came out a little better than Broadcasting in the survey, but in the cumulative duplication study—this being worked out for-

wards and backwards and six ways toward the middle—if Broadcasting is put on the list before Sponsor, the value of Sponsor can be minimized. Conversely, it works the other way with Sponsor placed on the list first.

\* \* \* \* \*

"The enclosed set of charts proves Advertising Age's value, and can also be used to prove the superiority of Broadcasting over Sponsor even though Sponsor came in ahead of you on the survey. And this is the way I ask our men to interpret these charts."

As far as the use of all this material is concerned, the evidence shows that Advertising Age employed the report, the brochure and the film as selling adjuncts, as they were intended to be. Some 600 copies of the Crossley report itself were distributed. More than 1,300 copies of the brochure were shipped to salesmen by August 11, 1959. "The Real McCoy" was shown to prospective advertisers approximately 242 times between August 11, 1959 and August 10, 1960.

Most of the prospects subjected to this propaganda were sellers of time, i. e., radio and television networks and stations and their representatives. Advertising Age also used it, however, in an effort to convince print media of the desirability of advertising in Advertising Age. When Advertising Age's partner in the enterprise, Sales Management, protested, Lewis undertook to justify this use. In a letter to Sales Management dated April 22, 1960, he argued that except for the time buyers and some agency people in television production, the persons on the prospect lists were just as much the "objectives" of print media as of time media.

Sponsor also made rather extensive use of the survey in seeking advertising from radio and television stations, for the survey results were helpful to Sponsor to the extent that Sponsor showed up better than the other broadcast books.

Just how much advertising business Advertising Age obtained by the use of

the survey, brochure and film and how much Sponsor lost by it, is hard to say with any certainty. The statistics show that Advertising Age had approximately 501 pages of broadcast advertising in 1957, 469 in 1958, 391 in 1959, 564 in 1960, 524 in 1961, 485 in 1962 and 449 in 1963. Sponsor had approximately 2,-510 pages in 1957, 2,156 in 1958, 2,149 in 1959, 1,955 in 1960, 1,636 in 1961, 1,398 in 1962 and 1,186 in 1963.

These statistics in themselves prove little. Each publication increased its advertising rates during the period, Advertising Age in 1958 and 1961, and Sponsor in 1960 and 1962. These rate increases may have affected the result.

Sponsor had other troubles also. There were frequent changes in its executive personnel. Glenn found it necessary to discharge sales executives on the ground of inefficiency. Sponsor's salesmen heard complaints from customers on a variety of grounds. Some disliked Sponsor's editorial policy, others thought it made too many mistakes. Some customers reduced their advertising for reasons of their own, such as a reduced advertising budget, without regard either to Advertising Age or to Sponsor.

Lewis advised Sales Management on April 1, 1960 that "The Crossley S–D survey has been hurting Sponsor." This was shortly before Sponsor began the present action on May 11, 1960. This opinion may have had some basis in fact, but, of course, it does not afford an accurate measure of the damage.

I turn now to consider the legal basis of plaintiff's claim. He predicates it both on the Lanham Act and on the common law. He contends that he has proved a case of unfair competition and also of injurious falsehood.

*The Lanham Act Claim*

The Lanham Act relates to trade marks. In its concluding sentence it also refers to unfair competition. 15 U.S.C. § 1127 states:

"The intent of this chapter is to regulate commerce within the control of Congress by making actionable the deceptive and misleading use of marks in such commerce; to protect registered marks used in such commerce from interference by State, or territorial legislation; to protect persons engaged in such commerce against unfair competition; to prevent fraud and deception in such commerce by the use of reproductions, copies, counterfeits, or colorable imitations of registered marks; and to provide rights and remedies stipulated by treaties and conventions respecting trade-marks, trade names, and unfair competition entered into between the United States and foreign nations."

The phrase "to protect persons engaged in such commerce against unfair competition" inserted in the middle of this sentence does not, in and of itself, create a general federal law of unfair competition in interstate commerce. This general language must be attributed to a particular section of the Act.[13] American Auto. Ass'n v. Spiegel, 205 F.2d 771 (2d Cir. 1953), cert. denied, 346 U.S. 887, 74 S.Ct. 138, 98 L.Ed. 391 (1953).

The particular section on which plaintiff relies is Section 43(a) (15 U.S.C. § 1125(a)). That section provides:

"Any person who shall affix, apply, or annex, or use in connection with any goods or services, or any container or containers for goods, a

---

13. It is settled in this circuit that this language cannot be attributed to Section 44 of the Act, 15 U.S.C. § 1126, which relates to rights arising under international conventions or treaties. That section does not create a general law of unfair competition. American Auto. Ass'n

v. Spiegel, infra; Vanity Fair Mills, Inc. v. T. Eaton Co., 234 F.2d 633 (2d Cir. 1956), cert. denied, 352 U.S. 871, 77 S.Ct. 96, 1 L.Ed.2d 76 (1956).

Plaintiff here does not contend otherwise.

false designation of origin, or any false description or representation, including words or other symbols tending falsely to describe or represent the same, and shall cause such goods or services to enter into commerce * * * shall be liable to a civil action by any person * * * who believes that he is or is likely to be damaged by the use of any such false description or representation."

This section creates a limited new federal statutory tort. The American Rolex Watch Corp. v. Jack Laufer & Jan Voort, Inc., 176 F.Supp. 858 (E.D.N.Y.1959).

Doubtless this tort could be said to be a species of unfair competition. Whether this label is accurate makes little difference. It is immaterial what we call it. The question is whether defendant committed the tort, whatever its name, which this section defines. The answer to the question depends on (1) the meaning of the statute, and (2) the evidence in this case.

Defendant argues for a narrow construction of this section. Defendant contends that (a) it should be limited to false designations and false descriptions or representations in connection with trade marks or analogous to trade mark violations, and (b) in any case, it should be applied only to the "palming off" situation in which a defendant represents his goods to be those of the plaintiff.

Certain decisions in other circuits support this restricted interpretation. Chamberlain v. Columbia Pictures Corp., 186 F.2d 923 (9th Cir. 1951); Samson Crane Co. v. Union Nat. Sales, Inc., 87 F.Supp. 218 (D.Mass.1949), aff'd, 180 F.2d 896 (1st Cir. 1950).

Other decisions in other circuits reject it. L'Aiglon Apparel, Inc. v. Lana Lobell, Inc., 214 F.2d 649 (3rd Cir. 1954); Parkway Baking Co. v. Freihofer Baking Co., 255 F.2d 641 (3rd Cir. 1958) (dictum); Gold Seal Co. v. Weeks, 129 F.Supp. 928 (D.D.C.1955) (dictum), aff'd, S. C. Johnson & Son, Inc. v. Gold Seal Co., 97 U.S.App.D.C. 282, 230 F.2d 832 (1956), cert. denied, 352 U.S. 829, 77

S.Ct. 41, 1 L.Ed.2d 50 (1956); Norwich Pharmacal Co. v. Hoffmann-La Roche, Inc., 180 F.Supp. 222 (D.N.J.1960).

■ In this circuit there is no decision of the Court of Appeals directly in point on this question. There are decisions of the district courts which have discussed it. They make it clear that Section 43(a) may be violated by a false designation, description or representation even though no trade mark is involved. The American Rolex Watch Corp. v. Jack Laufer & Jan Voort, Inc., supra; Zandelin v. Maxwell Bentley Mfg. Co., 197 F.Supp. 608 (S.D.N.Y. 1961).

These cases involve palming off; therefore their actual holdings cannot be said to establish that palming off is an unnecessary element. Palming off was also involved, to some extent, but in a general rather than a specific sense, in Mutation Mink Breeders Ass'n v. Lou Nierenberg Corp., 23 F.R.D. 155 (S.D. N.Y.1959). There the members of a mink breeders' association attacked defendant's conduct in advertising its imitation mink garments in terms calculated to lead purchasers to believe that they were made of real mink. There was no attempt to palm off the garments as the product of any particular plaintiff. Judge Bryan denied defendant's motion to dismiss the complaint for failure to state a claim. He said (23 F.R.D. at 161):

"For § 43(a) of the Lanham Act creates a new 'federal statutory tort, *sui generis*' and does not merely codify the common law principles of unfair competition."

In Smith-Victor Corp. v. Sylvania Electric Products, Inc., 242 F.Supp. 302 (N.D.Ill., E.D.1965), defendant was accused of making untrue representations as to the properties and performance of its "Sun Gun," a light-producing device which it sold in competition with plaintiff's "light bar." Plaintiff sought damages for alleged violation of Section 43 (a). The court denied defendant's motion to dismiss the complaint. It held

that Section 43(a) includes misrepresentations which do not refer to trade marks and misrepresentations which do not amount to palming off. After reviewing the conflicting decisions, the court said (242 F.Supp. at 311):

> "I must determine which interpretation of the statute is most reasonable. The plain language of the statute applies to a case such as the one at bar. Where the language of the provision is clear, and when that language is not inconsistent with other provisions of the statute, then the provision must be considered as it is written."

■ Section 43(a) does not mention palming off. It forbids "any" false description or representation in connection with goods or services. I see no basis for limiting its application to this particular kind of misrepresentation.

What is a misrepresentation used "in connection with" goods? Some of the cases cited above have held in effect that a false representation in an advertisement of goods is a use "in connection with" them. L'Aiglon Apparel, Inc. v. Lana Lobell, Inc., supra; Zandelin v. Maxwell Bentley Mfg. Co., supra; Mutation Mink Breeders Ass'n v. Lou Nierenberg Corp., supra; Smith-Victor Corp. v. Sylvania Electric Products, Inc., supra.

It would seem that a false representation contained in a report, brochure or film prepared for selling purposes is as much a representation used "in connection with" goods as a representation in an advertisement.

■ What is meant by "goods"? In the present case we are concerned, not with a "Sun Gun" or an imitation mink coat, but with a publication. The Commissioner of Patents, acting under his authority (15 U.S.C. § 1112) to "establish a classification of goods and services," has by regulation classified "prints and publications" as goods. 37 C.F.R. § 6.1, 15 U.S.C.A.App. § 6.1. The Commissioner's interpretation of the statute, while not binding, is entitled to great weight. I accept it. Defendant's publi-

cation, tangible objects of personal property sold in interstate commerce, clearly constitutes "goods" under the Lanham Act.

■ To sum up, I construe the statute broadly enough to include a false representation in a report, brochure or film which relates to a trade publication sold in interstate commerce and which was prepared and used for the purpose of securing advertising for that publication. The question remains whether there was a "false representation" within the meaning of the statute.

In most of the decided cases on this subject there was allegedly a misrepresentation, express or implied, as to a material fact which related to defendant's product. Thus, "Glass Wax" contained no wax (Gold Seal Co. v. Weeks, supra), defendant's garments were not made of real mink (Mutation Mink Breeders Ass'n v. Lou Nierenberg Corp., supra), defendant's "Sun Gun" produced less than the promised 35,000 candle power (Smith-Victor Corp. v. Sylvania Electric Products, Inc., supra) etc. Was there such a misrepresentation here?

What happened in this case, in essence, is this. Defendant made a survey of the readership preferences of persons on the prospect lists of thirteen time selling organizations. A plurality of those persons who responded to the questionnaire replied that they read defendant's publication regularly and found it most useful. That fact was stated in the Crossley report and in defendant's brochure and film.

The fact that a plurality of the respondents did say that they read Advertising Age regularly and found it most useful is undeniable. The report and the brochure and the film correctly set forth the results of the survey. In this respect the case differs markedly from Domestic Engineering Co. v. Conover-Mast Publications, Inc., 154 F.Supp. 948 (N.D.Ill., E.D.1957), relied upon by plaintiff, where the court specifically found that the results of the survey were incorrectly and fraudulently tabulated by defendant.

Moreover, plaintiff has not proved that the prospect lists were tampered with by defendant or that the master list was not properly compiled. The respondents were in fact persons on the prospect lists. And although it is true that Lewis participated actively in organizing the survey and in drafting the questionnaire and in arranging for the compilation of the list, there is no evidence that he acted improperly.

Furthermore, the report, brochure and film did not in fact represent that the respondents were all "time buyers" in the technical purchasing agent sense. There is no doubt about this, despite plaintiff's prolonged argument on this subject. The report, brochure and film made it abundantly clear that the respondents were claimed to be people who were "involved in" time buying decisions, people who were "influential" in buying time, in a sense broader than the actual purchasing agent.

Plaintiff's fundamental criticism of the report is that many people on the prospect lists had nothing to do with time buying. There is almost no evidence to support this contention. The editor of Time Magazine is the only specific instance which comes to mind. He was one out of 16,077 names.

■ Moreover, this whole subject is essentially a matter of argument. The report, brochure and film correctly stated the fact that the respondents were persons on the prospect lists of time selling organizations. Defendant argued that therefore these prospects must be involved in some way in time buying. The premise of this argument was fairly stated. The advertiser to whom the argument was addressed was free to make up his own mind as to its validity. In my opinion this is different from a flat statement that a lamp produces a specified candle power. As far as this fundamental criticism goes, therefore, plaintiff has not made out a case for relief.

■ The same may be said of plaintiff's claim that the survey questions were too "unfocused." The report, bro-

chure and film set forth the questions exactly. The reader could decide for himself whether they were too broad to justify defendant's argument.

In addition to this basic criticism, plaintiff has found fault with various details of the report, brochure and film. I have catalogued each of these criticisms in the earlier pages of this opinion. Some of them are literally justified. But I cannot escape the conclusion that they are trivial and that they do not add up to the kind of misrepresentation which I believe the Lanham Act was intended to cover.

■ The "media/time buyer" label is high on this list. It is true that this phrase is inaccurate in an analytical sense, as I have heretofore pointed out. But the inaccuracy does not impress me as being serious enough to constitute a misrepresentation. It must be borne in mind that the audience to which this material was addressed was highly sophisticated. Broadcasting people know what "media" means and what "time" means in this business. They know the difference between a media director and a technician who contracts for space in a newspaper or a spot on a broadcast program. If defendant's prospective customers paid any attention to this phrase at all, they must have appreciated that it purported to create a category which included more than the strict purchasing agent of time.

We are dealing here with the advertising business and with advertising men. They are not given to understatement. They habitually put their best foot forward, they emphasize the good points and gloss over the weak points. I am confident that they understand each other's technique and make due allowance for it.

■ As far as the claim of "forging Sponsor's endorsement" is concerned, it is true that defendant's brochure and film misquoted Sponsor's All Media Evaluation Study. I do not condone this misquotation. But it is not a false statement of the results of the survey. It is not a false representation as to defendant's product. It is merely an unfair

argument with which defendant attempted to bolster its thesis that many people other than "time buyers" are involved in time buying decisions. The evidence shows that the thesis itself is a valid one, as indeed Sponsor has recognized on other occasions.[14] This misquotation does not amount to a false representation within the meaning of Section 43(a).

I regard the brochure's use of the "reader duplication studies" in much the same light. It was unfair to Sponsor vis-a-vis Broadcasting Magazine, to set up these studies in such a fashion that, to use Lewis' words, they could "be used to prove the superiority of Broadcasting over Sponsor even though Sponsor came in ahead of" Broadcasting. But again, this is not a misrepresentation with respect to defendant's product. Advertising Age came in ahead of both Sponsor and Broadcasting, and this fact was correctly stated in the documents. Moreover, the tabulations contained in the report, brochure and film accurately revealed that Sponsor came in ahead of Broadcasting. I doubt, therefore, that it can be said that the arrangement of the data in the cumulative duplication studies was "false" at all. In any event, it was not, in my opinion, the kind of false representation contemplated by the Lanham Act.

Plaintiff's other criticisms of the report, brochure and film are unsubstantial. Plaintiff has gone over these documents with meticulous care. He attacks and makes much of the tiniest departure from perfect candor. This seems to me to be an unrealistic way to dissect advertising material created by advertising men to be read by advertising men. I find and conclude that plaintiff has failed to prove a false representation used in connection with goods within the meaning of Section 43(a) of the Lanham Act.

### The Claim for Injurious Falsehood

In considering this common law claim, we are faced at the outset with a choice of the applicable law. In this diversity case, this court applies the New York rule of conflicts of law. Klaxon Co. v. Stentor Electric Mfg. Co., 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941).

The problem, as is so often the case, is to determine what the New York rule of conflicts is.

The Crossley report and the brochure were delivered, and The Real McCoy was exhibited, by defendant's salesmen to prospective customers in many different states. In this respect, the case is akin to the "multi-state publication" of defamatory matter in a book or periodical. There the New York courts have adopted a "single publication" rule, at least for the purposes of the statute of limitations. The numerous publications give rise to only one cause of action. Gregoire v. G. P. Putnam's Sons, 298 N.Y. 119, 81 N.E.2d 45 (1948).

But the New York cases are not explicit as to where this single cause of action arises or as to what law governs it. Zuck v. Interstate Publishing Corp., 317 F.2d 727, 734 (2d Cir. 1963); Nagoya Associates, Inc. v. Esquire, Inc., 191 F.Supp. 379 (S.D.N.Y.1961).

As a general rule in tort cases, New York now follows the "grouping of contacts" or "center of gravity" principle of conflicts. Babcock v. Jackson, 12 N.Y.2d 473, 240 N.Y.S.2d 743, 191 N.E. 2d 279, 95 A.L.R.2d 1 (1962).

Both parties have attempted to group the contacts with, as usual, opposite re-

---

14. Sponsor has run self-laudatory advertisements in its own magazine which assert that "SPONSOR sells the TEAM that buys the TIME"; that "for every timebuyer there are ten other decision makers behind the scenes who read Sponsor"; and that "in the purchase of time for any McCann [-Erickson] client an entire team of top executives are always involved." Its advertisements have characterized as "blue-ribbon" buyers of time people with titles as diverse as secretary, clerk, account executive, creative director, media director, vice-president, manager, and owner.

sults. Plaintiff asserts that his claim has more contacts with Illinois, where defendant's principal office is located, from which Lewis directed the distribution of the report, brochure and film. Chicago, according to plaintiff, was the "hub and nerve center" of defendant's campaign. Defendant, on the contrary, argues for New York on the theory that New York is plaintiff's domicile and principal place of business, and that it is where Crossley's office is located and where Crossley sent out the questionnaires and tabulated the replies.

I consider it unnecessary to decide this question, for there seems to be no significant difference between Illinois law and New York law on the subject at hand. There are more cases in New York and they are more articulate, but the rule which they lay down is consistent with the more generalized statements in the Illinois decisions.

In discussing his common law claim, plaintiff avoids precise definition. He lumps together "unfair competition," "disparagement," "injurious falsehood," and "prime facie tort," perhaps on the theory that there is safety in a multiplicity of labels. This attitude finds some justification in the Illinois cases which also, in the main, give only a broad and inexact treatment to the problem. Thus, they frequently cite a statement in an old Illinois case, Doremus v. Hennessy, 176 Ill. 608, 52 N.E. 924, 54 N.E. 524, 43 L.R.A. 797 (1898), which on its facts bears no resemblance to the case at bar. The court there said:

> "It is clear that it is unlawful and actionable for one man, from unlawful motives, to interfere with another's trade by fraud or misrepresentation * * * with an intent to inflict an injury which causes loss." (52 N.E. at 925).

And again:

> " 'Malice' * * * means an intent to do a wrongful harm and injury. An intent to do a wrongful harm and injury is unlawful * * *;

an act maliciously done, with the intent and purpose of injuring another is not lawful competition." (52 N.E. at 926).

Perhaps most relevant of the more recent Illinois cases is Pendleton v. Time, Inc., 339 Ill.App. 188, 89 N.E.2d 435 (1950), which involved only the sufficiency of the complaint. Plaintiff, a portrait painter, alleged that defendant maliciously, with intent to injure plaintiff, had published a false statement to the effect that someone other than plaintiff had been the first to paint a portrait of President Truman. This was held to state a cause of action.

 The New York cases are more specific. They indicate that the appropriate label, if one needs a label for the claim which plaintiff asserts, is the tort of injurious falsehood. It is not a "prima facie tort" as the New York cases define that vague term, for the New York rule is that in order to commit that tort, defendant's sole motive must be to injure plaintiff. If defendant acts from mixed motives, one of which is the furtherance of his own business interest, that is not enough. Penn-Ohio Steel Corp. v. Allis-Chalmers Mfg. Co., 7 A.D.2d 441, 184 N.Y.S.2d 58 (1st Dept. 1959); Miller v. Kornella Corp., 32 Misc.2d 869, 229 N.Y.S.2d 675 (Sup.Ct.1962).

The evidence in the present case demonstrates that at the very least, defendant's primary motive was the securing of business for itself.

Every New York case which has discussed this subject has arisen on the pleadings. The point at issue has always been the sufficiency of the complaint. No case has been found which deals with the sufficiency of the evidence after a trial.

 The rule laid down by the cases is, in essence, that an intentionally false statement, made without legal justification, and made maliciously, i. e., with actual intent to harm plaintiff, or with reckless disregard of the consequences under such circumstances as would lead a

reasonably prudent man to anticipate that harm to plaintiff would ensue, gives rise to a cause of action for the damage which plaintiff has sustained. Penn-Ohio Steel Corp. v. Allis-Chalmers Mfg. Co., supra; Gale v. Ryan, 263 App.Div. 76, 31 N.Y.S.2d 732 (1st Dept. 1941); Rochester Brewing Co., Inc. v. Certo Bottling Works, Inc., 192 Misc. 629, 80 N.Y.S.2d 925 (Sup.Ct.1948); see Hornell Broadcasting Corp. v. A. C. Nielsen Co., 8 A.D.2d 60, 185 N.Y.S.2d 945 (4th Dept. 1959), aff'd in part, and appeal dismissed in part, 8 N.Y.2d 767, 201 N.Y.S.2d 781, 168 N.E.2d 115 (1960).

The New York cases are not in complete agreement as to the type of damage that plaintiff must sustain. Some decisions have held a complaint insufficient because only general damages, rather than special damages, were alleged. Frawley Chemical Corp. v. A. P. Larson Co., 274 A.D. 643, 86 N.Y.S.2d 710 (1st Dept. 1949); Henkin v. News Syndicate Co., 27 Misc.2d 987, 210 N.Y.S.2d 302 (Sup.Ct.1960), aff'd, 19 A.D.2d 862, 243 N.Y.S.2d 667 (1st Dept. 1963).

Other decisions have upheld complaints which appear to have alleged only general damages, without commenting on this aspect. Advance Music Corp. v. American Tobacco Co., 296 N.Y. 79, 70 N.E.2d 401 (1946) (prima facie tort); Rochester Brewing Co., Inc. v. Certo Bottling Works, Inc., supra.

And recently in Morrison v. National Broadcasting Co., 24 A.D.2d 284, 266 N.Y.S.2d 406 (1st Dept. 1965), a case which involved a tort somewhat analogous to injurious falsehood, the Appellate Division, by a divided court, held that an allegation of general damage was sufficient.

 Leaving the matter of damages aside for the moment, the question here is whether plaintiff has proved a cause of action for injurious falsehood. My conclusion is that he has not. What has been said in the discussion of the Lanham Act claim applies here. The Crossley report, the brochure and the film were not false, in the way that the statements complained of in the cases cited above were false. The factual statements were true, except for a few inaccuracies too trivial to be material. The conclusions which defendant drew from those facts, conclusions which plaintiff challenges, were, as I have said, matters of argument.[15]

Furthermore, plaintiff has not proved that defendant acted maliciously with intent to injure Sponsor or with reckless disregard of the probability of such injury. It is true that defendant's purpose was to use the survey results as a sales argument. But everyone who sells his product in competition with the products of others hopes to take business away from his competitors. Obviously, this is not in itself a tortious injury.

 Plaintiff has made much of Lewis' letter of December 3, 1958 in which he said that he had "taken off the silk gloves" and that his main objective was to put some of the broadcasting publications "on the spot." Having had an opportunity to observe Lewis on the witness stand for approximately one week, and having read much of his correspondence, I believe I have a fair idea of his personality. He is ebullient and colorful. This is just the kind of letter that he would write. I do not believe that it is a sufficient foundation upon which to base a finding that defendant maliciously intended to injure Sponsor. And this conclusion is reinforced by another phrase in the letter in which Lewis said that his purpose was to "expose them [the broadcast publications] to some comprehensive and honest findings

---

15. I have not overlooked defendant's misquotation in the brochure of Sponsor's All Media Evaluation Survey. The brochure did attribute, in quotation marks, to Sponsor's study something which the study had not said. This is not enough to give rise to a cause of action for injurious falsehood, nor is there any proof that this particular remark caused any damage to plaintiff.

# 908

which they will find difficult to distort." The evidence shows that competition among trade publications for advertising is keen and that arguments between competing publications are not infrequent as to the accuracy of the conclusions which they draw from their respective studies, surveys and questionnaires.

 Lewis' comment about the cumulative duplication studies does show a desire on his part to interpret the Crossley survey so as to favor Broadcasting Magazine as against Sponsor. Whether in fact defendant's salesmen so interpreted it to their customers is open to doubt. There was no convincing proof that they did. There was proof, on the other hand, that Sponsor made capital for itself out of the survey in which, as correctly stated in the report and brochure, Sponsor fared better then Broadcasting. I conclude that this remark of Lewis' is also an insufficient foundation upon which to predicate a finding of malice.

In view of the conclusion which I have reached on the merits of plaintiff's claim, it is unnecessary to discuss the question of damages. I may say, however, that there was no evidence of special damage in any substantial amount. Whether general damages could be awarded if plaintiff had established a cause of action is by no means clear under the present state of the law in New York and Illinois. There is no need to decide that question here.

Pursuant to Rule 52(a), this opinion constitutes the court's findings of fact and conclusions of law.

Certain motions made at the conclusion of the trial as to which decision was reserved are disposed of as follows:

Plaintiff's motion to strike certain defendant's exhibits is denied.

 Plaintiff's motion to strike defendant's defense of unclean hands is granted. That defense is not appropriate in an action at law. I have paid no attention to it in deciding this case.

The Clerk is directed to enter judgment in favor of defendant.

So ordered.