**AMES PUBLISHING COMPANY et al.**

v.

**WALKER–DAVIS PUBLICATIONS, INC., et al.**

**Civ. A. No. 73–2420.**

United States District Court,
E. D. Pennsylvania.

March 7, 1974.

Harold E. Kohn, Philadelphia, Pa., for plaintiffs.

John T. Clary, Philadelphia, Pa., for defendants.

## FINDINGS OF FACT, CONCLUSIONS OF LAW AND ORDER

TROUTMAN, District Judge.

Following a hearing held on plaintiff's motion for a preliminary injunction and defendant's motion to hold plaintiff in contempt and for a preliminary injunction pertaining to the Court's order of November 23, 1973, we enter the following:

### Findings of Fact

#### I. The Parties

1. Flexrock Company is a partnership which manufactures building maintenance materials, roof coatings, mechanical packing and industrial plastics and engages in publishing of controlled circulation magazines and related activities.

2. Plaintiff, Ames Publishing Company (Ames) is a division of Flexrock Company, a partnership, wherein plaintiffs, Benjamin J. Wasserbly, Florence E. Milner, Leonard M. Wasserbly, Richard Milner and C. George Milner, Esquire, are the partners. Leonard Wasserbly is the partner in Flexrock who is in charge of the Ames operations.

3. Defendant, Walker-Davis Publications, Inc. (Walker-Davis) is a Pennsylvania corporation formed in April of 1973, and the individual defendants, Michael J. Gillespie (Gillespie), William R. Jennings (Jennings), Edwin Farley (Farley), Francis McGill (McGill), Robert Regan (Regan), John O'Kane (O'Kane), together with one other, not named as a defendant, are the shareholders of Walker-Davis.

#### II. The Market

4. The magazines published by the parties are distributed by means of "controlled circulation". "Controlled circulation" is the means by which magazines are directed to certain sections of the business or industrial communities for no charge. The advertiser can measure the effectiveness of its advertising by either direct response in the case of mailing of post card decks or books to the advertiser, or by the return of post cards directly to the publisher in which case the publisher then informs the advertiser of the extent of readers' interest.

5. "IMPO". IMPO stands for Industrial Maintenance and Plant Operation which is a controlled circulation magazine published for many years by Ames. "SPN" stands for Safety Product News, which is another publication of Ames directed to the plant safety field and started by Ames in 1967. "IDN" is Industrial Distributor News, another magazine publication of Ames which was started by Ames in 1959.

6. "PED" stands for Plant Engineers Digest and Product Report, the

**4**

publication of Walker-Davis, which is the subject of this litigation. The charter issue of this magazine was mailed in October of 1973, and the first issue will be mailed in February, 1974.

7. Standard Rate and Data Service" (SRDS) is a publication listing other publications broken down by specific categories, together with advertising for those publications. The magazines which are the subject of this litigation, together with their competitors, are listed in Section 113(b) covering plant engineering and plant operations.

8. PED now competes with IMPO and appears in SRDS Classification 113B, devoted to maintenance, repair and operations magazines concerned with plant engineers and maintenance.

9. IMPO and PED, a new magazine competitive with IMPO and published by defendants, are in a market where circulation is particularly important.

10. Circulation is the primary factor upon which an advertising manager of a company or a media purchaser in an advertising agency judges a controlled circulation magazine and places advertising in it. Other important factors are editorial environment, content and cost.

11. Other than PED, all of the magazines considered to be competitors of IMPO are audited by the Business Publications Audit of Circulation, Inc. (BPA).

12. "Business Publications Audit of Circulation" (BPA) is an independent audit bureau which audits the circulation lists of trade publications to make sure that their breakdown circulation is in conformance with their promotional material. BPA takes a sample from a circulation list, projects the sample over the entire list and determines list accuracy. It then issues a BPA statement which is used in the selling of advertising in controlled circulation publications.

13. "Association of Industrial Advertisers" (AIA) is an association of industrial advertisers. As part of the association's functions, AIA furnishes forms to publishers who then send them out and return them to AIA, after which if AIA finds they are properly filled out, AIA returns them to the publisher who makes reprints of them and uses them to sell advertising.

14. A media buyer will refer to a publisher's promotional material first to ascertain the kind of market to which the publication is directed. The media buyer will then rely upon the confirmed sources for circulation information, such as a BPA audit.

15. If a magazine has both a BPA statement and an Association of Industrial Advertising (AIA) statement, the advertiser will generally rely upon the BPA statement.

16. The BPA statement, the Standard Rate and Data (SRDS) listing and the publisher's own information are all relied upon to a greater extent than is the AIA statement for circulation information.

17. A great deal of detail, effort and expense is required to qualify a list to BPA standards.

18. "Verification". Verification applies to a name contained on a circulation list which is checked against another source, such as a reader response card, business directories, association rosters and other trade lists. When used in conjunction with BPA audits, however, it would additionally mean that the circulation list is so coded for computer purposes that the source of the name is contained on the circulation list.

19. "Qualified". Qualified, for purposes of this opinion, means that a given name meets the requirements set forth by the publisher for receiving the magazine.

20. "List Qualified by Function" means that a name on the list shows the function of the person whose name appears on the list.

21. The "highest form" of verification—the one considered most valuable and most saleable—is direct response from the recipient to the publisher.

22. Cost elements in qualification and verification include computer serv-

ice, salaries of the circulation department personnel, purchase of new lists, postage and printing involved in mailing of verification forms, analysis of reader response cards and duplication checking.

23. All publishers in the field use Standard Industrial Classification (SIC) numbers to describe their circulation.

24. "SIC". These initials stand for Standard Industrial Classification which is a means by which the United States Department of Commerce classifies various industrial companies. The first two digit numbers indicate the field in general and there is a further refinement made by adding two additional digits to the first two digits. The magazines involved in this litigation; namely, IMPO and PED, are directed primarily to SIC classifications 19 through 39.

25. Getting a functional breakdown is difficult and expensive because of the repetition of questionnaires necessary to gather the required information.

26. The normal way for a new magazine to describe its circulation is to state in promotional material the circulation which it will have in its initial edition and make only such claims for that circulation as the publisher is sure will be true for that first edition.

27. The normal and accepted way of dealing with qualification and verification of a new and as yet unaudited magazine is to state that: "Circulation will be audited within the minimum time allowed by BPA rules and regulations" or words to that effect.

### III. *Ames Publishing Company*

28. Ames started out by publishing a magazine for the customers of Flexrock. It later branched out in its publication of IMPO, to a controlled circulation list, and still later, added IDN, SPN and purportedly published one issue of IMPO Buyer's Guide, which was, in fact, not mailed out.

29. Ames Publishing Company presently publishes three magazines: Industrial Distributor News (IDN); Safety Product News (SPN); and Industrial

Maintenance and Plant Operation (IMPO).

30. Industrial Maintenance and Plant Operation (IMPO), Ames' principal publication, is an "MRO" book (Maintenance, Repair and Operation). These books are read by plant engineers who are primarily in charge of maintenance and repair of the equipment in their plants. It is a "horizontally" targeted book, reaching a broad cross-section of industry.

31. The circulation firgures in the IMPO SRDS listings have been supported by forwarding its BPA statements.

32. The total cost involved in maintaining, verifying and qualifying Ames circulation lists is approximately $300,000 per year.

33. The Ames circulation lists are confidential.

### IV. *The Individual Defendants and the Formation of Walker-Davis Publications*

34. Defendant Jennings was Ames' research manager prior to May 1, 1973.

35. For eight years prior to May 1, 1973, defendant Farley was director of circulation at Ames. Defendant Farley presently handles the circulation and reader service work for Walker-Davis.

36. Defendants Farley and Jennings reported to defendant Gillespie at Ames prior to May 1, 1973.

37. Defendant Gillespie was employed by Ames for 15 years. The last position held was entitled Marketing Director, but his duties primarily were in the sales function and he had charge of the sales representatives for Ames and received an override commission from some of these sales representatives.

38. For a period of time in 1972 and 1973, discussions were had between Gillespie and Wasserbly concerning the possibility of Gillespie receiving an equity interest in Ames. Further discussions were also held concerning Gillespie, Jennings, and Farley receiving a share in the profits of the publication of card

decks if Ames should go into that business.

39. In March of 1973, Gillespie, together with Farley and Jennings, were directed by Leonard Wasserbly to report on a Saturday morning for the purpose of a meeting, at which time they were told that Ames was going into the card deck business and they would not share in the profits.

40. After a two-week vacation, Gillespie returned to Ames on April 30, 1973, at which time he told Leonard Wasserbly that he was quitting and the following day, May 1, was directed to leave the premises.

41. Farley, Gillespie and Jennings all left Ames at the same time.

42. John O'Kane, Robert Regan, John Schirra, Bob Hoysgaard, Lionell Scott, William Downes, John Hartnett and Henry Nagle, all of whom are presently affiliated with Walker-Davis were formerly engaged in the selling of IMPO.

43. Defendant McGill was promotion manager and editorial director of Ames until July, 1972.

44. In May of 1972, McGill gave Leonard Wasserbly notice that he was leaving Ames for several reasons.

45. Later, in June of 1972, McGill met with Leonard Wasserbly and told him that he was going to publish card decks. He asked for support from Wasserbly, principally financial support, which Wasserbly declined to provide.

46. Mr. Wasserbly, however, did encourage McGill to go into the business and told him that the business must be completely independent of Ames, in that the circulation lists must not be Ames' circulation lists, and that if McGill were successful, he would bring McGill back into Ames as a separate profit center with Ames and McGill sharing in the profits.

47. Thereafter, McGill contacted Gillespie and Farley, asked them for support which they provided financially, and Farley went to work building a new circulation list.

48. Thereafter, Direct Response Media in September of 1972, issued its first card deck, which was sent to the mailing list built up with the help of Farley.

49. Walker-Davis was incorporated as a Pennsylvania corporation on April 12, 1973, while defendants Farley, Gillespie, Jennings and O'Kane were still employed by Ames.

50. Gillespie, Farley and McGill each own 25% of the shares of Walker-Davis. The remaining 25% is divided between O'Kane, Regan and Jennings.

51. Thereafter, a decision was made to publish a magazine which would be competitive with IMPO, which fact was made known to the public, in May of 1973, and again in July of 1973.

V. *Walker-Davis Promotional Information*

52. Walker-Davis began to put together promotional material for PED, which material was disseminated in July of 1973 by way of a media or tell-all kit.

53. A "Media Kit or Tell-All Piece" is a collection of promotional materials used by sales representatives of publishers to sell advertising. It contains, inter alia, brochures, AIA statements, samples of the magazines, and as audited, BPA statements.

54. The media or tell-all kit is entitled "Introducing a New Magazine" and contains certain statements in the present tense and in the past tense, together with a breakdown of the circulation list. It is used by Walker-Davis salesmen in personal meetings with clients and it is also mailed to potential advertisers.

55. Farley supplied the circulation figures for defendants' media kit.

56. The circulation information in defendants' promotional material and SRDS advertisements is "projected", not actual, and has not actually been "verified" as claimed.

57. The circulation list contained in the brochure was produced by taking the existing Walker-Davis list, and by statistical sample which was then projected

over the entire list, the breakdown was obtained.

58. The data for the circulation chart in defendants' media kit was obtained, according to defendants, by taking a sample of the DRMC list and projecting figures which defendants thought they would be able to obtain sometime in the spring of 1974, at the time intended for their first BPA audit.

59. PED has claimed, in its promotional material since July, 1973, a circulation including 113,000 plant engineers qualified by title and function. That statement is also a "projection".

60. The statement in defendants' promotional material that PED concentrates its circulation on plants that have fifty or more employees is a similar "projection" of hoped-for future concentration.

61. The statement in defendants' media kit under the heading "the primary source: 'person to person' contact" that "the overwhelming majority of names of the Plant Engineers' Digest circulation have been verified through actual contact between publisher and recipient: letters requesting the magazine, cooperative post card mailings, WATS line calls and response to circulation verification mailings" is a projection.

62. Walker-Davis never had or utilized a WATS line.

63. The statement in defendants' media kit that "Plant Engineers' Digest brings you the most current list of plant engineers available: nine out of ten names have been verified within the past twelve months" was a "projection" and was not true when stated.

64. The claims in defendants' media kit of "list currency", "readers we have heard from in the past twelve months" was a "projection". It does not reflect actual responses.

65. In order to have an SIC breakdown, a circulation department must code all of the source documents as they come in. There was no coding or other breakdown by SIC classification of the Walker-Davis list as of October, 1973.

66. Defendants' questionnaires relating to function were first sent out in September, 1973, card pack mailings.

67. Farley does not know how many responses have been received to questionnaires relating to function.

68. The circulation information on the SRDS "reprint" advertisement was taken by defendants from defendants' media kit.

69. The August 24, 1973, issue of SRDS Business Publications contained an ad and free listing side by side for IMPO. In the same issue of SRDS, defendants placed two advertisements for PED, one of which was designed to look like a free listing. This was accomplished by following the standard SRDS listing format paragraph by paragraph. Reprints of the PED SRDS ad were included in its media kits.

70. Because defendants' SRDS "listing" was neither sworn to nor audited, it was published in SRDS with the designation "advertisement" and surrounded by a black border.

71. The SRDS reprint as circulated by defendants with their media kit, does not have the black border around it, as did the ad in SRDS, nor does it have the designation "advertisement". One reading it would thus be led erroneously to conclude that it is a free listing.

72. As restatements of the figures in defendants' media kit the numbers for circulation on SRDS advertisements were really "just 'projections'" from a list that defendants had.

73. The statement in defendants' media kit that "qualification mailings and telephone surveys were used to verify these lists" was also untrue at the time it was made.

74. The claim in defendants' media kit that the IPE cards were circulated strictly to the 63,000 plus plants that do most of the country's business was a circulation target, not a description of actual circulation.

75. The IPE AIA media data form filed by defendants on April 23, 1973, contains a circulation analysis by SIC

classification, which analysis defendants could not make at any time during 1973, due to the uncoded nature of their list.

76. The AIA media data form erroneously claims that defendants' list is culled for duplicates.

77. Defendants have made and circulated in interstate commerce promotional materials falsely describing the circulation of their magazine, PED, including the following statements which were, in fact, "projections":

"A. "113,000 PLANT ENGINEERS, QUALIFIED BY TITLE AND FUNCTION. Plant Engineers' Digest takes you to more plant engineers than any other publication: 113,000 qualified two ways—by title and by plant engineering function.

B. "BIG PLANTS: THE 60,000 THAT DO 85% OF THE BUSINESS. There are about 300,000 manufacturing plants in the United States. But a mere 20% of them—some 60,000 plants—do roughly 85% of the business. These are the plants that have 50 or more employees. And these are the plants in which Plant Engineer's Digest concentrates its circulation.

C. "THE PRIMARY SOURCE: 'PERSON TO PERSON' CONTACT. The overwhelming majority of names on the Plant Enginer's Digest circulation have been verified through actual contact between publisher and recipient: letters requesting the magazine, cooperative post card mailings, WATS line calls, and response to circulation verification mailings.

D. "LIST CURRENCY: READINGS WE'VE HEARD FROM IN THE PAST TWELVE MONTHS. Plant Engineer's Digest brings you to the most current list of plant engineers available: 9 out of 10 names have been verified within the past 12 months".

E. All figures appearing in the chart entitled: FULL PROFILE INFORMATION: BY SIC, BY INDUSTRY, BY UNITS, BY FUNCTION, BY TITLE, BY PLANT SIZE.

F. "FUNCTIONAL ANALYSIS OF CIRCULATION:

| | |
|---|---|
| Manage all plant engrg. & maint. | 44,372 |
| Supervise plnt. eng. sub-group | 20,562 |
| Plnt. engrg. staff or consult. service | 23,531 |
| Manage other operations in addition to plnt. engr. | 25,353 |
| Total Plant Engineering Function | 113,818 |
| All others | 11,546." |

78. A reasonable reading of the claims for circulation breakdowns, qualification and verification contained in defendants' media kit is that they were claim of actual circulation for PED commencing with the Charter Issue in October, 1973.

79. Actually, however, the figures in defendants' promotional materials were only, as described by defendant Farley, "what we hoped to have". As to the ultimate reliability of defendants' "projected" claims, Farley testified that: *"Some of the information that you have seen in the promotion material will, in fact, turn out to be fact".*

VI. *Ames Publishing Company's Promotional Information*

80. In 1962 Ames promoted and sold advertising for a publication called "IMPO Buyer's Guide", promising a circulation of 75,000. Only 5,000 copies were printed. Ames billed and collected revenues based on the 75,000 copies—even though they were never printed or distributed.

81. The AIA statement issued by Ames for IMPO in May of 1973, and part of their media or tell-all kit contains the following inaccuracies:

(i) Reference to the Ames Universe list and number of units contained therein is not true because no such list exists.

(ii) The statements concerning publishers pass-along studies are untrue since no pass-along study was, in fact, made.

(iii) Certain statements purported by Ames to concern the editorial research and evaluation are also not true and have no basis in fact.

(iv) The statements relating to editorial reprints, requests, and distribution, have no basis in fact and are not true.

82. Statements contained in Ames' AIA statement for SPN issued in May of 1973 and used by salesmen in their tell-all or media kits to sell advertising, contain misleading statements as follows:

(i) The statement that a recipient study was performed in November of 1972 by circulation department and the figures set forth therein are not true.

(ii) The statement that the unit count of plants was based on a publishers' count of November-December, 1972, issue is not true and correct.

(iii) The reference to the SPN number of units in Universe is not true since Ames does not have a Universe list.

(iv) The purported pass-along study performed in November of 1972 and the purported results thereof are not true in that these studies were not performed.

(v) Certain editorial, research and evaluation services set forth in the statement have no basis in fact and are not true.

(vi) The numbers shown for requests for editorial reprints and the number of editorial reprints sent have no basis in fact and are not true.

(vii) References in this brochure to breakdown of function is also misleading since Ames does not break down its circulation by function.

83. Jennings instructed that the 1973 AIA statements for Ames be prepared according to the parameters of the past AIA statements.

84. Drafts of the AIA statement were presented to Jennings for revision.

Jennings in turn passed them on to Gillespie.

85. Circulation information in the Ames AIA statements were taken from the BPA statements prepared by Farley. The remaining figures in the AIA statement were all provided by the marketing department, under the direction of Gillespie.

86. The IMPO AIA statement was prepared under Bill Jennings' direction and was signed three days after Jennings left. The figures and descriptions of circulation in the statement, to the extent they are not provided by the BPA statement, were provided by the research department, formerly headed by Jennings and supervised by Gillespie.

87. Leonard Wasserbly was never told of any inaccuracies in the IMPO AIA statement prior to his signing it and authorizing its distribution.

88. The unit count in the SPN AIA Statement of 46,000 units is inaccurate. SPN does not have a unit audit. The figure was provided by Farley and approved by Jennings.

89. Ames' brochure advertising its Universe list for IDN is false and misleading in that the categories set forth therein are merely inflated counts of the categories contained in the Table of Contents of the ID directory, Ames' competitor, rearranged with false and fictitious numbers assigned to each category therein. The ID directory contains the words, "Each page of this volume is fully protected by copyright and no part may be reproduced without written permission".

90. The rental of the IDN Universe list which was conducted by Ames was done under false pretenses since the list information was not accurate.

91. The brochure used to promote SPN and contained in the SPN Media or tell-all kit is misleading in that it states that SPN goes to 46,300 plants when, in fact, such statements are not true.

92. The media data form introducing SPN in 1967, claimed SIC breakdown.

The circulation figures in the SPN media data form were provided by Mr. Farley.

93. The Ames' current publication "Good News" which is directed to advertisers, contains misleading statements in that:

(i) The reference to number of plants reached by SPN has no basis in fact.

(ii) The statement that the list for IMPO reaches 102,708 plant engineers is not true and as such is misleading. This list admittedly reaches only 79,649 plant engineers; a difference of 23,059.

94. Ames uses fictitious names in the masthead of publications.

## VII. *Irreparable Harm*

95. There are approximately 27,000 advertisers in business publications presently, of whom between 1500 to 2000 are in the market for whose business IMPO and PED compete.

96. Advertisers overlap between IMPO and its principal competitor in SRDS 113B, Plant Engineering, is only about 40%.

97. There was 95% overlap, 133 out of 140, between IMPO and the Charter Issue of PED. Five of the remaining seven charter advertisers of PED were on the prospect identifier program of Ames which Ames distributed to its salesmen and sales representatives.

98. Advertising contracts for IMPO for 1974 are down approximately 30% from 1973.

99. The loss of business to Ames is expressed in terms of units of advertising. One unit equals one-ninth of an IMPO page.

100. There were 520 units of advertising in the January, 1973 IMPO. There were only 385 units for January, 1974.

101. Since the departure from Ames of defendants, and subsequent departure of the salesmen who went with them, IMPO's market share has shrunk from 16.1% to 14.5%.

## VIII. *Harm to Defendants*

102. Beyond the conclusory statement by defendant Gillespie that the full and precise relief sought by plaintiffs herein would put defendants out of business, there is no conclusive evidence of any harm which would befall defendants if their false advertising were enjoined and/or corrective statements were issued.

## IX. *Contempt*

103. Defendants have failed to offer any conclusive evidence of any disparaging acts or statements after November 23, 1973.

## *Discussion*

### A. *The Lanham Act*

 Plaintiffs' claim regarding defendants' promotional and advertising activities arises under Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), for which jurisdiction in this Court is conferred by 15 U.S.C. § 1121. In the enactment of Section 43(a) Congress provided a new and distinct federal tort, *sui generis*, Norman M. Morris Corp. v. Weinstein, 466 F.2d 137, 141 (5th Cir. 1972); Gold Seal Co. v. Weeks, 129 F. Supp. 928, 940 (D.D.C.1955), aff'd. sub nom., S. C. Johnson v. Gold Seal Co., 97 U.S.App.D.C. 282, 230 F.2d 832, cert. denied, 352 U.S. 829, 77 S.Ct. 41, 1 L.Ed.2d 50 (1956); Franklin Mint, Inc. v. Franklin Mint, Ltd., 331 F. Supp. 827, 831 (E.D.Pa.1971); Glenn v. Advertising Publications, Inc., 251 F. Supp. 889, 902 (S.D.N.Y.1966); Mutation Mink Breeders Ass'n. v. Lou Nierenberg Corp., 23 F.R.D. 155, 161 (S. D.N.Y.1959), providing a remedy by way of civil damages or injunction against anyone who, in connection with goods or services in commerce, uses a false designation of origin or any false description or representation. Parkway Baking Co. v. Freihofer Baking Co., 255 F.2d 641, 648 (3d Cir. 1958); L'Aiglon Apparel v. Lana Lobell, Inc., 214 F.2d

649 (3d Cir. 1954). In L'Aiglon, Judge Hastie stated:

> "We find nothing in the history of the Lanham Act to justify the view that this section is merely declarative of existing law. Indeed, because we find no ambiguity in the relevant language of the statute we would doubt the propriety to resort to legislative history even if that history suggested that Congress intended less than it said. It seems to us that Congress has defined a statutory civil wrong of false representation of goods in commerce and has given a broad class of suitors injured or likely to be injured by such wrong the right to relief in federal courts." 214 F.2d at 651.

Consistent with the broad sweep accorded Section 43(a) by our Court of Appeals are the holdings of other courts that Section 43(a) is a remedial provision and its language should be broadly construed. Geisel v. Poynter Products, 283 F.Supp. 261, 267 (S.D.N.Y.1968); Maternally Yours v. Your Maternity Shop, 234 F.2d 538 (2nd Cir. 1956) (Clark, J., concurring). Under this expansive interpretation, there is no need to show that any false description or representation is wilful or intentional. Parkway Baking Co. v. Freihofer Baking Co., *supra*, 255 F.2d at 648; Gold Seal Co. v. Weeks, *supra*, 129 F.Supp. at 940. All that is required is that the representations or descriptions either be "false" or such as is "tending falsely to describe or represent" the goods or services in question. Thus, liability is not restricted solely to descriptions which are literally false, but extends to instances where the defendant creates a false impression. Geisel v. Poynter Products, *supra*, 283 F.Supp. at 267.

■ Section 43(a) of the Lanham Act proscribes, in pertinent part, the "use in connection with any goods or services . . . any false description or representation, including words or other symbols tending falsely to describe or represent the same . . . ." Although this provision is contained in the Lanham Act, which primarily relates to federally registered trademarks, it is clear that liability under Section 43(a) may arise for a false description or representation even though no trademark is involved. Glenn v. Advertising Publications, Inc., *supra*, 251 F.Supp. at 902; American Rolex Watch Corp. v. Jack Laufer & Jan Voort, Inc., 176 F.Supp. 858 (S.D.N.Y.1961). While the intent of the Lanham Act is to regulate commerce by making actionable the deceptive and misleading use of trademarks, it is also designed " . . . to protect persons engaged in such [interstate] commerce against unfair competition . . . ." 15 U.S.C. § 1127, and accordingly the scope of Section 43(a) extends beyond the protection of trademarks. We must now determine whether the plaintiffs' claims in the instant case fall within the purview of Section 43(a).

■ Plaintiffs' claim generally that defendants have engaged in false advertising in connection with the promotion of their new controlled circulation magazine, Plant Engineer's Digest. Specifically, they claim that material statements contained in their promotional brochure or "media kit", which was distributed to prospective advertisers, were false and misleading. The question whether a false representation in a brochure prepared for the purpose of selling advertising in connection with a publication falls within the purview of Section 43(a) was answered in the affirmative in Glenn v. Advertising Publications, Inc., 251 F.Supp. 889 (S.D.N.Y. 1966). There, the Court held defendant's publication constituted "goods" within the meaning of the Lanham Act and concluded that:

> " . . . the statute [is broad] enough to include a false representation in a report, brochure or film which relates to a trade publication sold in interstate commerce and used for the purpose of securing advertising for that publication." 251 F. Supp. at 903.

Accordingly, defendants' representations were made "in connection with . . . goods and services" within the meaning of the statute, and the question remains whether such representations were false.

The promotional brochure or "media kit" issued by defendants to potential advertisers, contains certain statements and breakdowns pertaining to defendants' circulation and to the verification of defendants' circulation list as detailed in our findings of fact. It is this brochure and the statements and breakdowns contained therein with which we are primarily concerned. These statements concerning circulation and verification of lists are presented in the present and past tenses, which would create the impression that the information contained in the brochure represented the present actual circulation and breakdown thereof and that the lists were actually verified according to the methods specified therein. In fact, the assertions as to circulation are "projected" rather than actual and have not been verified as claimed. In the field of controlled circulation publications, circulation is an important, if not the primary, factor on which an advertiser relies in placing his advertisement and a reasonable reading of the claims for circulation breakdowns and verifications is that they were claims of actual, not projected, circulation for PED commencing with the Charter Issue in October, 1973. While defendants' claims are projected claims which defendants may in good faith have hoped to achieve and, at this time, may, in fact, have been achieved, they were, nonetheless, presented as a fait accompli and were not true at the time advertisers would have relied on them for the purchase of advertising. Plaintiffs have not shown nor are they required to show that defendants' representations were wilfull or intentional, and notwithstanding defendants' good faith, defendants' "projected claims" were not true when made and, therefore, constitute false representations within the meaning of Section 43(a) of the Lanham Act.

The relief sought by plaintiffs in this action is an injunction prohibiting false advertising by defendants in the future and a mandatory injunction in the form of corrective advertising. In actions of this type seeking an injunction, there is no requirement that purchasers actually be deceived or that plaintiff prove he was actually damaged by a diversion of customers. Plaintiff need only show that the false representations "have a tendency to deceive". Parkway Baking Co. v. Freihofer Baking Co., 255 F.2d 641, 649 (3d Cir. 1958). Geisel v. Poynter Products, Inc., 283 F.Supp. 261, 267 (S.D.N.Y.1968). Other than a showing of a diminution of units of advertising sold for the current year, plaintiffs have not shown any reliance by advertisers on the false representations nor have they shown that the primary cause of their loss of advertising was due to the false claims of defendants. In fact, there is a distinct lack of any testimony on this record provided by either party from independent advertisers in the field. While we are cognizant of the fact that advertisers are generally sophisticated in their own field and are less likely to be as susceptible to deceptive devices as would the general public, see Glenn v. Advertising Publications, Inc., supra, 251 F.Supp. at 904, we must determine whether defendants' claims on their face show a "tendency to deceive". In so far as defendants present their circulation as their actual circulation in existence at that time, and provide projected circulation breakdowns in statistical detail to reinforce that impression, such a presentation has the requisite tendency to deceive. More importantly, while an astute advertiser might inquire as to the circulation claims of an initial publication, he would be less likely to inquire as to whether there has been actual verification of the list, and by what method. Thus, under the relaxed standard for the obtaining of an injunction as set forth in Parkway Baking, we conclude that the false representations contained in

defendants' media kit show a tendency to deceive.

### B. *Irreparable Harm*

In their effort to show irreparable injury, plaintiffs have produced testimony indicating that advertising contracts for IMPO, which is directly competitive with defendants' publication, PED, in the plant maintenance and operation field of trade publications, are down approximately 30% from 1973. In addition, they have produced testimony to the effect that advertising units decreased from 520 units in January, 1973, to 385 units in January, 1974, and that since the departure of the individual defendants IMPO's market share decreased from 16.1% to 14.5%. In order to create the inference that the respective decreases in advertising units and market share were caused by the departure of the individual defendants and by their subsequent false advertising, plaintiffs noted that there was approximately a 95% overlap of advertisers, 133 out of 140, between IMPO and the Charter Issue of PED. In actions under Section 43(a) of the Lanham Act, as previously indicated, a plaintiff need not show he was actually damaged by the false representations of defendant, but need only show a likelihood of damage. *Parkway Baking Co. v. Freihofer Baking Co., supra.* We have heretofore concluded that plaintiffs have made the requisite showing, and where such a showing is made, injunctive relief under Section 43(a) of the Lanham Act may be granted even where pecuniary injury to the plaintiff may be slight. 2 J. T. McCarthy, Trademarks and Unfair Competition (1973) § 27:5 at 250. While plaintiff may ultimately attempt to recover damages under this section by showing actual diversion of trade caused by defendants' representations, the difficult burden which would be imposed upon plaintiffs would render any such recovery speculative or conjectural. Accordingly, we conclude that plaintiff has made the requisite showing of irreparable harm for the entry of injunctive relief under this section and the speculative possibility of the recovery of damages in the future does not bar such relief.

### C. *Clean Hands*

In the answer to the complaint and in the hearing conducted in this matter, defendants have affirmatively asserted the equitable doctrine of clean hands as a bar to injunctive relief in this action. In our findings of fact we concluded that plaintiffs have made representations in connection with the publications of IMPO's Buyers Guide and Good News and in connection with the 1973 AIA statements for their publications which may have transgressed the very provisions of the Act under which they now seek relief. Thus, the question arises whether the equitable doctrine of clean hands applies in an action arising under Section 43(a) of the Lanham Act.

In Colligan v. Activities Club of New York, Ltd., 442 F.2d 686 (2d Cir. 1971), the Courts of Appeals for the Second Circuit held that consumers lack standing to bring an action under Section 43(a) of the Lanham Act on the ground that the exclusive purpose of the Act, as defined in 15 U.S.C. § 1127, is to "protect the interests of a purely commercial class against unscrupulous commercial conduct". 442 F.2d at 692. In *Gold Seal Co. v. Weeks, supra,* 129 F. Supp. at 940, the Court concluded that Section 43(a) represents "an affirmative code of business ethics" designed to protect an *honest* competitor in his fair business dealings. The provision, however, was not designed to provide a windfall for an overly eager competitor. *See also* Parkway Baking Co. v. Freihofer Baking Co., supra, 255 F.2d at 649. Thus, under these cases, it appears in the light of the clear purpose of Section 43(a) that to permit a suitor with unclean hands to obtain injunctive relief would run afoul of the legislative goals. Accordingly, we conclude that the equitable maxim of clean hands is clearly applicable and may be raised in actions seeking injunctive relief under Section 43(a). While unarticulated in the Act

itself, an underlying purpose of Section 43(a) appears to be protection of the consuming public from false representations and descriptions in connection with the advertising of goods and services. See J. T. McCarthy, Trademarks and Unfair Competition, § 27:3 at 246–47. Thus, in balancing the equity between the parties, it is appropriate that the Court also weigh the interest of the consuming public.

While plaintiffs do not seriously contest the applicability of the doctrine of clean hands in actions of this nature, they assert that it is not applicable under the facts of this case. Preliminarily, plaintiffs raise several grounds in support of their contention which may be forthwith dismissed. Initially, plaintiffs state that they are not guilty of unclean hands because they approved no fraudulent or deliberate conduct. This contention obviously relates to the 1973 AIA statements which were prepared by some of the individual defendants while still in the employ of Ames. While this may be true, the statements were nonetheless approved by Leonard Wasserbly, a named plaintiff in this action, and issued under the aegis of Ames Publishing Company. Since the statements were materially false, it is of no consequence that they were not issued wilfully or with intent to deceive. Secondly, plaintiffs assert that conduct which is said to constitute unclean hands must have occurred in reference to the "very matter in controversy", McLaughlin v. McLaughlin, 410 Pa. 1, 187 A.2d 905 (1963), and that the matter in controversy is the launching of defendants' publication and the advertising and promotion connected therewith. We view plaintiffs' conception of the subject-matter of this action as being somewhat narrow and consider the subject-matter in a broader perspective relating to the promotion and sale of advertising for trade journals.

Of more significance is plaintiffs' suggestion that the doctrine is inapplicable because the conduct complained of was not directed at defendants nor did it injure them. Pomeroy Equity Jurisprudence (9th ed.) § 399. Virtually all of the conduct cited by defendants pre-dated the existence of their business. Moreover, some of the defendants themselves participated in the preparation of the 1973 AIA statements of which defendants now complain. Another ground asserted to render the doctrine inapplicable is that the conduct complained of is not current or has been corrected. *Pomeroy, supra.* While the failure to distribute the IMPO Buyer's Guide following the sale of advertising therefor in 1962 is the most egregious example of plaintiffs' conduct, it is clearly too remote to bar injunctive relief in this case. On the other hand, the representations contained in the 1973 AIA statements and the Ames publication "Good News" are of more recent vintage. In this regard, plaintiffs represent to the court that the misleading information in the AIA statements has been withdrawn and that corrective advertising would appear in the next issue of "Good News". While such action is commendable, we note that plaintiffs have not provided any affirmative corrective measures with respect to the AIA statement, similar to that which they seek to impose upon defendants. A balancing of the equities may require that the public be afforded some protection as to plaintiffs' past practices.

In summary, the equitable doctrine of clean hands is not a rigid formula, but requires the free and just exercise of discretion. Johnson v. Yellow Cab Co., 321 U.S. 383, 64 S.Ct. 622, 88 L.Ed. 814 (1944). In exercising our discretion we must strike an equitable balance not only between the interests of the parties, but also the interests of the consuming public. Since the advertisers, with whom we are concerned in this action, lack standing to bring suit on their own behalf, they must rely on a "vicarious avenger" of their interest, who has emerged from this case somewhat tarnished. To deny an injunction on the basis that plaintiffs are also

blameworthy would leave two wrongs unremedied and thereby increase the injury to the public. Republic Molding Corp. v. B. W. Photo Utilities, 319 F.2d 347 (9th Cir. 1963). Thus, considering the facts (1) that the vindication of the wrong committed against the public interest mandates a remedy; (2) that plaintiffs' conduct occurred prior to the formation of defendants' enterprise and was not directed at defendants and did not injure them in any way, and (3) that some of the individual defendants participated in the conduct of which they now complain, we conclude that the doctrine of unclean hands does not apply in this case to bar injunctive relief.

Since a major thrust of our decision is directed toward the vindication of a wrong against the public interest, we do not seek to provide a windfall to the plaintiffs, who submitted a proposed order which could potentially lay the foundation for the collapse of defendants' nascent enterprise. We are satisfied that the wrong will be sufficiently remedied by a statement that the media kit contained only projections, followed by a correct statement of the present circulation figures and breakdowns which have been actually verified by the means stated. Accordingly, we have modified plaintiffs' proposed order, deleting any reference to this action and any admission of a violation of the Lanham Act and in the interest of balancing the equities have provided for possible protection to the public as regards misleading practices heretofore engaged in by the plaintiffs.

### Conclusions of Law

1. This Court has jurisdiction over these proceedings pursuant to 15 U.S.C. § 1121.

2. Venue is proper in this judicial district.

3. Defendants have used and are using false descriptions of their products sold in commerce, specifically of the circulation and readership of their magazine, Plant Engineers Digest and Product Report. Such conduct is proscribed by the Lanham Act, 15 U.S.C. § 1125(a).

4. Such false descriptions and unfair competition should be restrained and remedied by the granting of injunctive relief.

5. Injunctive relief is properly granted under the Lanham Act upon a showing of a "tendency to deceive" purchasers and without requiring a showing of actual deception.

6. Based upon the evidence submitted in the proceedings thus far, plaintiffs have shown a likelihood of their prevailing upon final hearing.

7. The continuing and irreparable harm hereinabove found to be sustained by plaintiffs and the public necessitates appropriate preliminary injunctive relief.

8. Based upon the evidence, defendants have shown a likelihood that the plaintiffs have violated the Lanham Act, 15 U.S.C. § 1125.

9. The equitable doctrine of clean hands does not bar injunctive relief in this action, but may require some balancing of the equities involved.

### ORDER

And now, this 7th day of March, 1974, upon cross-motions and after full hearing and consideration of all relevant papers filed herein, it appearing to this Court that defendants have and are actually engaged in using false descriptions and representations in advertising in commerce and will continue to commit such acts to plaintiffs' and the public's irreparable injury, and it further appearing that there is no basis for the entry of any injunction or judgment of contempt against plaintiffs, it is ordered that defendants, their officers, agents, servants, employees, attorneys, representatives and all others acting on their behalf or in active concert or participation with them, are hereby restrained and enjoined until final determination from using in the advertising, promotional materials and solicitation of advertisers or other customers (a) any

false description of the circulation, subscribers or subscriber or circulation lists of defendants and/or their products; and (b) any statements or representations concerning the attributes, quality or makeup of the circulation or circulation lists of defendants and/or their products which are not verified and accurate at the time such statements are made.

Defendants shall cause to be published and issued at their expense, by registered mail to each person, firm and agency to whom or which defendants have previously given, sent or otherwise distributed or caused to be distributed, all or any part of defendants' Media Data Kit for Plant Engineers Digest and Product Report, the following notice:

"To Whom It May Concern:

"Walker-Davis Publications, Inc. gives notice that the circulation claims made in the promotional materials for Plant Engineers Digest and Product Report, IPE and OSHA cards, were misleading in that those claims reflected a future "projection" of circulation and did not accurately describe the actual circulation of our products at that time.

"The claims for list verification, qualification, currency, description of function within the plant engineering field and size of plant were projections of what we hoped to achieve.

"Claims that all names on our circulation list have a title and company address were projections prior to January, 1974.

WALKER-DAVIS PUBLICATIONS, INC.

Michael J. Gillespie, President
 Publisher

Francis McGill, Vice President
 Executive Publisher

Edwin Farley
 Circulation Director."

Defendants may also include in said notice their actual circulation which they presently have along with any breakdowns or verification thereof.

To the extent that affirmative action is forthwith required of the defendants, the effect of this order is temporarily stayed pending submission by the plaintiffs of an affidavit or affidavits specifically advising the Court as to what action has been taken by the plaintiffs to correct misleading statements contained in AIA statements and what action will be taken to correct misleading advertising heretofore contained in "Good News", (see page 15 of this opinion) thus affording the Court the opportunity to formulate appropriate order, if necessary, to correct misleading representations engaged in by the plaintiffs.