**WALKER–DAVIS PUBLICATIONS, INC.**
**d/b/a Plant Energy Management**

v.

**PENTON/IPC, INC.**

Civ. A. No. 80–1165.

United States District Court,
E. D. Pennsylvania.

March 3, 1981.

John T. Clary, Peter M. McGonigle, Clary, Mimnaugh & McGonigle, P.C., Philadelphia, Pa., for plaintiff.

Charles Rust, Elaine Harmon, Woodling, Krost & Rust, Cleveland, Ohio, William Shields, Monteverde, Hemphill & Maschmeyer, Philadelphia, Pa., for defendant.

## MEMORANDUM OPINION

WEINER, District Judge.

This is an action for damages and injunctive relief alleging false representation and advertising, and trademark registration violations, brought pursuant to § 43(a) and § 37 of the Lanham Act, 15 U.S.C. § 1125(a) and § 1119, and for unfair competition and tortious interference with actual and prospective business relationships, brought pursuant to the court's pendant jurisdiction. Defendant's counterclaim alleges trademark infringement pursuant to § 32(1) of the Lanham Act, 15 U.S.C. § 1114(1). Trial was held before this court, sitting without a jury. For the reasons to follow, we find against plaintiff on its § 43(a) claim of false advertising and representation, in favor of plaintiff on its § 37 trademark registration claim, and against defendant on its § 32(1) trademark infringement counterclaim.

I

Plaintiff, Walker-Davis Publications, Inc. (Walker-Davis) is the publisher of a magazine entitled "Plant Energy Management." Defendant, Penton/IPC, Inc. (Penton) is the publisher of a magazine entitled "Energy Management". "Plant Energy Management" and "Energy Management" are "controlled circulation" magazines. A controlled circulation magazine is not ordinarily sold but is distributed at no charge to qualified recipients in certain sections of the business or industrial communities. The publisher's revenue is derived from the sales of advertising in the publication. Both "Plant Energy Management" and "Energy Management" have similar editorial content and as a result would appeal to largely overlapping groups of potential advertisers, so that the magazines are therefore competitors in the sale of advertising space.

Circulation refers to the number of magazines distributed to qualified "primary recipients." It is an important factor by which an advertising buyer judges a controlled circulation magazine and decides whether to place advertising in it. Other important factors are cost of advertising, and editorial environment and content. "Cost per thousand" is a commonly used term which reflects the advertising costs to the advertiser for each thousand of qualified circulation reached by a publication.

Advertisers obtain information about these factors from the publisher's promotional materials, from Business Publications Audit Statements, from entries in the publication "Standard Rate and Data Service" (SRDS), from advertisements and from direct sales calls. The peak selling period for advertising in controlled circulation magazines is during the fall and early winter of each year.

Business Publications Audit of Circulation, Inc. (BPA) is an independent organization which conducts audits of its member publications' controlled circulations. Because of the credence given BPA audit reports, such reports are an important source of circulation information for advertising buyers.

SRDS is a monthly publication designed for use by advertising buyers. It is comprised of listings, in a standard form for each magazine, of information relating to editorial policy, personnel, advertising rates and requirements, issue dates, circulation, and circulation distribution analyses. It is generally considered the "Bible" for media buyers.

For an unaudited magazine, the circulation figures published by SRDS are obtained from sworn and notarized statements submitted to SRDS by the publisher of each magazine. The standard manner of reporting circulation is as follows: for a magazine published fewer than four times a year, the circulation for the most recent past issues is reported and published, for a magazine published four or more times per year, the average circulation per issue for the six-month period ending June 30 or December 31 is reported at the end of such period and is reported and published by SRDS for the next six months.

The circulation representations in SRDS are labelled by date or time period which show that the reports are purely historical. A claim or guarantee of circulation for future issues may be made by a publisher and is listed in a special place at the end of the SRDS listing, but SRDS rules do not require that such a statement be made.

SRDS accepts paid advertising from publishers. Advertisements are placed as well in other publications read by advertising buyers. The advertisements for controlled circulation magazines commonly make claims respecting circulation, which as already noted, refers to the number of "original" or "primary recipients" or readers of the magazines. Claims are also made respecting "pass-along" or "secondary readership", which refers to others who, though not direct recipients of the magazine, read a primary recipient's copy. The total of the primary recipients and pass-along or secondary readers is referred to as "readers", "readers per copy", "audience", "total audience" and "reader audience", among others.

The first issue of "Plant Energy Management" was published in April, 1977. A trademark registration, on the Supplemental Register, was obtained by plaintiff for "Plant Energy Management" on August 15, 1978; No. 1,099,911.

"Energy Management" had its origin as a special section bound into and distributed with other publications of defendant, in particular the January 1975 issue of "Air Conditioning and Refrigeration Business", another controlled circulation magazine. The section also appeared in the January 1975 issue of defendant's "Government Product News", and was separately distributed to a list of General Services Administration members. The total circulation of the section was between 132,000 and 135,000.

All but one of the succeeding issues of "Energy Management" in 1976 through 1978 were bound into "Air Conditioning and Refrigeration Business", and mailed separately to an additional number of between 50,000 and 55,000 recipients, mostly consisting of the top operating officer at each of the locations covered. Except for the September 1976 issue, the covers of each separately mailed issue bore the registered trademark "Air Conditioning and Refrigeration Business", until April 1978. With the exception of the October 1975 and September 1976 issues, separately mailed issues until October 1979 bore the additional title "Presidential Report" on their covers, so that at various times the magazine was called "Presidential Report ENERGY MANAGEMENT", "Energy Management Presidential Report", and "Presidential Report on Energy Management". Until July 1980, the SRDS listing for "Energy Management" was headed "Energy Management Presidential Report". Penton obtained a trademark registration on the Principal Register for "Energy Management" on May 1, 1979, No. 1,117,230.

In the summer of 1979, Penton decided to change the frequency of issue of "Energy Management" starting with the October 1979 issue. The masthead of that issue properly indicated bi-monthly publication and the actual circulation of that issue was reported in SRDS in the form used for

historically reporting a magazine published at least quarterly.

In October of 1979 Penton made a decision to reduce the 1980 circulation of "Energy Management" to about 40,000. After the desired coverage pattern was structured a computer was used to eliminate units no longer thought to be as energy-use intensive as the others. The list was then personally examined by Penton personnel, in a process taking about nine weeks, to select the recipients best meeting its coverage goals.

The circulation of "Energy Management" has thus fluctuated in accord with Penton's evolving coverage goals. Penton has made various representations in SRDS, in an audited statement, and in its promotional materials, as regards the historical or the future circulation of various issues. The relevant representations, as sworn to and published in SRDS, are as follows:

| Energy Management Issue | Circulation | SRDS Issue |
|---|---|---|
| 10/77 | 104,948 | 1/78 through 6/78 |
| 4/78 | 102,920 | 7/78 through 1/79 |
| 10/78 | no circulation statement submitted to SRDS | |
| 4/79 | 80,128 | 7/79 through 1/80 |
| 10/79 | 75,644 (as average for last 6 mos. of 1979) | 2/80 |
| first 6 mos. of 1980 | 41,500 (guaranteed average, not sworn) | 3/80 through 7/80 |
| first 6 mos. of 1980 | 41,818 (average) | 8/80 |

A BPA audited statement indicated the following circulation:

(a) for the first six months of 1980: 42,065 (average)

(b) for the 2–3/80 issue: 43,221

(c) for the 4–5/80 issue: 41,497

(d) for the 6–7/80 issue: 41,477

Penton also distributed a 1979 circulation "fact sheet" in its promotional materials, published in 1979, which stated the circulation to be 78,805 for 1979. The "fact sheet" also claims a total circulation including 46,231 "chief executive officers." A 1980 circulation "fact sheet", along with a cover letter, were included in Penton's promotional materials and mailed on November 20, 1979, to all of "Energy Management's" advertisers, prospective advertisers, and their agencies, stated that for 1980 circulation would be 41,300, with a "total audience" of 144,550. This new "fact sheet" was ordered by Penton on October 19, 1979, soon after the decision to reduce circulation was made.

The 1980 "fact sheet" also contained an industry by industry breakdown of the magazine coverage of industrial units employing at least 250 people. The sheet indicated the number of such units for various industrial classifications, the "total circulation" for each classification, which in each instance was exactly twice the number of units employing at least 250 people, and the "total reader audience" for each classification, which in each instance was exactly seven times the number of such units. The cover letter stated that starting with February 1980, the frequency of publication would be six per year, that Penton had now identified the energy management market, and that "Energy Management" would reach 41,300 "primary decision makers" and a "total readership" of 144,550.

Penton also placed advertisements in the February, March, and August 1980 issues of SRDS claiming a "reading audience" of 144,550, and also in the March 1980 issue of "Industry Week", metalworking edition, claiming an "audience" of 144,550.

A Special Statement of Guaranteed Average for the first six months of 1980, which could have been inserted in an earlier issue of SRDS, did not appear until the March 1980 and subsequent issues. In those issues, by special arrangement with the SRDS publishers, no sworn circulation statement was given for the six month period ending December 1979, although such a statement would have been published under the normal SRDS policy.

The October 1975, June 1976, and September 1976 issues of Energy Management contained in their mastheads the logo of ABP, the American Business Press, Inc. The October 1975 and June 1976 issues contained in their mastheads the logo of BPA. Although the appearance of these logos signify that the magazine's circulation was audited, the circulation was in fact not au-

dited by ABP or BPA. An audit was conducted by BPA in July 1980.

## II

Plaintiff advances a variety of claims in regard to its allegations of false advertising and representation under § 43(a) of the Lanham Act, 15 U.S.C. § 1125(a)[1], each of which we find to be without merit.

■ Under § 43(a) of the Lanham Act it is not necessary to show that any false description or representation is wilful or intentional. · *Parkway Baking Co. v. Frei-hofer Baking Co.*, 255 F.2d 641, 648 (3d Cir. 1958). All that is required is that the representation or descriptions either be "false" or such as is "tending falsely to describe or represent the goods or services in question." *Ames Publishing Co. v. Walker-Davis Publications, Inc.*, 372 F.Supp. 1, 11 (E.D.Pa. 1974). Thus, liability is not restricted solely to descriptions which are literally false, but extends to instances where the defendant creates a false impression. *Id.*

■ To establish a cause of action for damages under § 43(a) plaintiff must show that the falsification actually deceives a portion of the buying public. *Parkway Baking Co. v. Freihofer Baking Co.*, 255 F.2d at 648. For an injunction, there is no requirement that purchasers actually be deceived, but only that the false advertisements or representations have a tendency to deceive. *Id.* at 649.

■ Walker-Davis asserts first that Penton, in its various SRDS listings, and in its "fact sheets" and advertisements, gave false and misleading information to the consuming public concerning Energy Management's circulation. Among the allegedly false and misleading information are

statements in SRDS, presumably in the January 1980 and February 1980 issues, respectively reporting the April 1979 circulation, and last six months of 1979 average circulation of Energy Management to be 80,128 and 75,644. This is asserted to be false and misleading because Penton had previously decided, in October 1979, to reduce the 1980 circulation to 41,500, which information should, according to plaintiff, have been reported by Penton in SRDS. This argument is without merit, because SRDS primarily reports historical circulation data, a policy of which advertising buyers who use SRDS are aware. Under the facts in this case, therefore, the statements were certainly neither false nor misleading, as they clearly referred to past circulation figures. The one instance cited by plaintiff of publication in SRDS of a prospective, non-historical average circulation statement by a magazine *increasing* its circulation does not establish that SRDS had a policy or that the industry had a custom regarding publication in SRDS of prospective circulation statements by a magazine *decreasing* its circulation.

Although a special statement reporting future rather than past circulation could have been submitted to SRDS, the continued reporting of historical data and failure to report the new circulation information prior to the March 1980 issue of SRDS does not constitute material misrepresentation on the part of Penton. This is especially so in view of the "fact sheet" and cover letter sent to Energy Management's advertisers and prospective advertisers. While these announcements were promotional in nature, they accurately reflected the new circulation figure and were an attempt by Penton to promptly notify advertising buyers of the

1. 15 U.S.C. § 1125(a) provides:

(a) Any person who shall affix, apply, or annex, or use in connection with any goods or services, or any container or containers for goods, a false designation of origin, or any false description or representation, including words or other symbols tending falsely to describe or represent the same, and shall cause such goods or services to enter into commerce, and any person who shall with knowledge of the falsity of such designation of origin or description or

representation cause or procure the same to be transported or used in commerce or deliver the same to any carrier to be transported or used, shall be liable to a civil action by any person doing business in the locality falsely indicated as that of origin or in the region in which said locality is situated, or by any person who believes that he is or is likely to be damaged by the use of any such false description or representation.

change in circulation. In this regard these materials served to dispel any confusion and offset any misleading misrepresentation which might otherwise have resulted from the change in circulation.

■ We reject as well plaintiff's assertion that the "fact sheet" and cover letter, and advertisements placed in SRDS and "Industry Week" were misleading as regards Penton's claims of a "total readership", "reader audience", and "audience" of 144,550. These terms would have been understood to refer to the total of "primary recipients" and "secondary" or "pass-along readers", and not merely to "primary recipients", as argued by plaintiff. The "fact sheet" plainly and unambiguously stated both the "total audience" (144,550) and the "circulation" (41,300) in large bold-faced type near the top of the page. There is simply no possibility of confusion between these two terms as used on the "fact sheet." The letter stated that Energy Management "reaches 41,300 primary decision makers with total readership of 144,550. While the letter does not use the term "circulation" to refer to the 41,300 figure, it surely does not leave the impression that it is the 144,550 figure, and not the 41,300 figure, which refers to the magazine's circulation. The advertisements in SRDS refer only to a "reader audience" of 144,550 and do not mention circulation, but there can be no doubt that these advertisements are not misleading. Not only would the term "reader audience" not be taken by advertising buyers to mean circulation, but these ads each appeared on the same page as and alongside the SRDS listing for "Energy Management" which stated the magazine's "circulation" figure. Under those circumstances, "reader audience" would not be taken to mean "circulation".

As for the 144,550 figure itself, plaintiff has not shown that Energy Management has not achieved a "pass-along" or "secondary readership" in that amount, or that the figure itself is in any way false.

■ Plaintiff also attacks the "fact sheet's" industry by industry coverage breakdown, which listed the number of units in each industry with 250 or more employees, and indicated that the total circulation of "Energy Management" for each industry was exactly twice the number of such units of 250 or more employees, and that the total "reader audience" for each industry was exactly seven times the number of such units. Plaintiff apparently claims that these figures are misleading because they assert that defendant sent exactly two copies of "Energy Management" to each of the units, and that exactly seven people at each location read the magazine, yet defendant did not actually have such coverage with its magazine. We agree with the defendant that it is not reasonable to interpret the figures to mean that exactly two copies would be sent to individuals working in each of various units, none of which contained less than 250 employees, and that exactly seven people in each unit would read one of those two copies. Rather, advertising buyers would more likely consider the figures to represent "horizontal", or even distribution over the various industries indexed and not actual distribution. At any rate, even if some advertising buyers might interpret the figures in an absolutely literal way, we decline to say that the sheet should therefore be judged misleading, for plaintiff has not shown that the magazine's coverage did not reasonably achieve that which was indicated in the "fact sheet".

■ Plaintiff next claims that as a result of the defendant's allegedly false circulation figures and representations, advertising buyers concluded that the cost per thousand for defendant's magazine was lower than that for plaintiff's magazine. Yet plaintiff has offered no evidence that Penton actually claimed a lower cost per thousand for "Energy Management" than for "Plant Energy Management", nor has plaintiff established that advertising buyers actually came to the conclusion that the apparent cost per thousand for "Energy Management" was less than its true cost per thousand.

■ Walker-Davis argues also that Penton has made claims that "Energy Management" was audited by ABP and BPA before such an audit was in fact made. Although the October 1975, June 1976 and September 1976 issues of "Energy Management" did contain the ABP and/or BPA logos even though the magazine's circulation was not audited, Walker-Davis has not shown that the appearance of the logos actually deceived any advertising buyers, or influenced any buying decisions, or that it even tended to do so. Moreover, except for these isolated instances the BPA logo has not reappeared on the "Energy Management" masthead. Under the circumstances, this argument must be rejected.

■ Yet another of plaintiff's arguments is that Penton misrepresented the quality of "Energy Management's" circulation as being to presidents or to chief executive officers. This claim has two separate aspects: the use of the words "Presidential Report" in the title of defendant's magazine, and the reference in one of defendant's "fact sheets" to "chief executive officers." We reject plaintiff's argument that by inclusion of the words "Presidential Report" in the title defendant portrayed its magazine as "reaching a presidential list." The "Presidential Report" subtitle cannot be taken as a claim of exclusive distribution to company presidents. Indeed, any such connotation is easily dispelled by the defendant's two "fact sheets", sent to buyers and potential buyers, which clearly indicate distribution to engineering management. We reject as well plaintiff's contention that Penton misused the term "chief executive officers", thereby overstating the number of such persons to whom the magazine was distributed. Plaintiff has not shown that any buying decisions were influenced by this representation, so that even if the circulation to chief executive officers was less than that claimed, defendant's inaccuracy is of minor importance.

Also without merit is the plaintiff's unproven contention that changes in the title of defendant's magazine regarding the use of the words "Presidential Report" created such uncertainty among advertising buyers concerning the number and identity of magazines in the industry that the buyers withheld advertising.

Finally, plaintiff's assertion that Penton made certain misrepresentations to the United States Postal Service is rejected as unfounded.

We conclude with a consideration of the significance of plaintiff's failure to put forth any evidence that would lead us to conclude that advertising buyers were in fact misled by any of defendant's representations. Without a showing that the buying public was actually deceived, a claim for damages under § 43(a) cannot succeed. *Parkway Baking Co. v. Freihofer Baking Co.*, 255 F.2d at 648. So long as advertising buyers were not actually misled, any representations made by defendant, even if arguably assumed to have been false, or to have had a tendency to falsely represent, were of no real consequence and were surely not at the expense of plaintiff. The demand for an injunction does not require actual deceit to succeed, *Id.* at 649, but in light of our finding that plaintiff's representations were not false or misleading and did not have a tendency to deceive, there is absolutely no basis for injunctive relief.

### III

We next consider plaintiff's claim for trademark infringement and unfair competition. Walker-Davis advances the argument that Penton's trademark "Energy Management" was improvidently issued and should be cancelled, pursuant to § 37 of the Lanham Act, 15 U.S.C. § 1119.[2] Plaintiff's contention is that the mark is generic,

---

**2.** 15 U.S.C. § 1119 provides:

In any action involving a registered mark the court may determine the right to registration, order the cancelation of registrations, in whole or in part, restore canceled registrations, and otherwise rectify the register with respect to the registrations of any party to the action. Decrees and orders shall be certified by the court to the Commissioner, who shall make appropriate entry upon the records of the Patent and Trademark Office, and shall be controlled thereby.

and thus not subject to the exclusive use of the defendant.

 Under the common law and the Lanham Act, an inherently distinctive trademark, that is, one which is either fanciful, arbitrary, or suggestive, does not require proof of secondary meaning in order to be legally protectable; but a non-distinctive or descriptive trademark only achieves protection if shown to have become distinctive, that is to have acquired secondary meaning. *Scott Paper Co. v. Scott's Liquid Gold, Inc.*, 589 F.2d 1225, 1228 (3d Cir. 1978); *McCarthy, Trademarks and Unfair Competition*, 815–1, p. 514. A generic term can never receive trademark protection or be validly registered, even if there is proof of secondary meaning. *Abercrombie & Fitch Co. v. Hunting World*, 537 F.2d 4, 9 (2d Cir. 1976); *CES Publishing Corp. v. St. Regis Publications, Inc.*, 531 F.2d 11, 13 (2d Cir. 1975); *McCarthy, supra*. A generic term is one which is commonly used as the name or description of a kind of goods. *Miller Brewing Co. v. G. Heileman Brewing Co.*, 561 F.2d 75, 79 (7th Cir. 1977), *cert. denied*, 434 U.S. 1025, 98 S.Ct. 751, 54 S.Ct. 752 (1978). It is a term that refers, or has come to be understood as referring, to the genus of which the particular product is a species. *Abercrombie & Fitch v. Hunting World*, 537 F.2d at 9. The reason for precluding appropriation of such common descriptive terms is clear: "to allow trademark protection for generic terms, i. e., names which describe the genus of goods being sold, even when these have become identified with a first user, would grant the owner of the mark a monopoly, since a competitor could not describe his goods or what they are." *CES Publishing Corp. v. St. Regis Publications, Inc.*, 531 F.2d at 13; *Miller Brewing Co. v. G. Heileman Brewing Co.*, 561 F.2d at 80.

In determining whether the title of a periodical is a valid trademark, the same tests must be met as in the case of goods. *CES Publishing Corp. v. St. Regis Publications, Inc.*, 531 F.2d at 14. In that case, Judge Friendly, writing for the panel, held that the name "Consumer Electronics Monthly" was generic when used as the title of a trade magazine. The magazine was distributed free of charge to manufacturers, distributors and dealers in the consumer electronics trade, and its title had been registered on the Patent Office's Supplemental Register.

Judge Friendly distinguished those decisions in which magazine names were found descriptive, but not generic, as cases not involving a trade magazine whose title was a word which named not only a class of goods but a class of magazines devoted to displaying and discussing those goods. In Judge Friendly's words, "it is hard to think of a name for a magazine, directed deliberately and effectively to industry personnel, which more accurately *names the class of trade magazines* within that industry than one which simply *gives itself the name of the trade* plus the word 'Monthly'." *Id.* at 14. (emphasis added)

In *Jenkins Publishing Co. v. Metalworking Publishing Co., Inc.*, 139 U.S.P.Q. 346 (T.T.A.B.1963), cited with approval by Judge Friendly, the title "Metalworking", used for a magazine distributed free to about 34,000 persons in various companies in the metalworking industries, was held to be incapable of exclusive appropriation since it was descriptive of the contents of a magazine devoted exclusively to advertisements and articles on metalworking equipment and supplies.

 "Energy Management" is a name which refers to the particular industry or field of interest to which defendant, and plaintiff, direct their magazines. Thus, as was the case with "Consumer Electronics Monthly" and "Metalworking", "Energy Management" names a class of trade magazines, as well as a particular trade or field of interest, by giving itself the name of the trade or field which is. the exclusive subject of its advertisements and articles. "Energy Management" is likewise deliberately directed and distributed free of charge to personnel within that trade or field which is named by its title. We therefore conclude that "Energy Management" is a generic name not capable of valid registration.

In reaching our decision, we are aware, as was Judge Friendly, that courts have been reluctant to find a magazine title generic. *See, e. g., American Association for the Advancement of Science v. Hearst Corp.,* 498 F.Supp. 244, 255–56 (D.D.C.1980), and cases cited therein. We are cognizant as well of the prima facie evidence of validity conferred on "Energy Management" by its registration on the Principal Register, as dictated by § 7(b) of the Lanham Act, 15 U.S.C. § 1057(b).[3] We are nevertheless not dissuaded from reaching the result which we do. In addition, we note that our conclusion comports with the expert opinion of plaintiff's trial witness, Mr. Murrell Leach, former Chairman of the Trademark Trial and Appeal Board.

Accordingly, we exercise our authority under § 37 of the Lanham Act to order the cancellation of defendant's registration, No. 1,117,230.

## IV

Since we have concluded that Penton is not entitled to any valid trademark protection for the name "Energy Management" and that its registration for "Energy Management" must be cancelled, it follows that Penton's counterclaim for trademark infringement brought pursuant to § 32(1) of the Lanham Act, 15 U.S.C. § 1114(1),[4] cannot succeed.

## V

Since plaintiff has put forth no evidence whatsoever to support its contention that defendant has tortiously interfered with plaintiff's actual or prospective business relationships, we find against plaintiff on this issue without the need for any further discussion.

## VI

In conclusion, plaintiff is entitled to no relief on its § 43(a) claims of false advertising and representation, or on its claim of tortious interference with business relationships. Plaintiff does prevail on its § 37 and unfair competition action for cancellation of defendant's trademark registration for "Energy Management", as a result of which defendant's counterclaim for trademark infringement cannot succeed.

The above memorandum opinion constitutes the court's findings of fact and conclusions of law, in accordance with Rule 52(a) of the Federal Rules of Civil Procedure.

---

**3.** 15 U.S.C. § 1057(b) provides:

(b) A certificate of registration of a mark upon the principal register provided by this chapter shall be prima facie evidence of the validity of the registration, registrant's ownership of the mark, and of registrant's exclusive right to use the mark in commerce in connection with the goods or services specified in the certificate, subject to any conditions and limitations stated therein.

**4.** 15 U.S.C. § 1114(1) provides for civil liability for infringement of a registered mark.